**PETTIBONE et al. v. COOK COUNTY, MINN.**

No. 48.

District Court, D. Minnesota, Fifth Division.
March 26, 1940.

882

Jenswold & Dahle, of Duluth, Minn., and Austin & Wangensteen, of Chisholm, Minn., for plaintiffs.

J. A. A. Burnquist, Atty. Gen., Chester S. Wilson, Deputy Atty. Gen., Geo. B. Sjoselius, Sp. Asst. Atty. Gen., and E. P. J. Chapman, Cook County Atty., of Grand Marais, Minn., for defendant Cook County.

SULLIVAN, District Judge.

The plaintiffs Holman D. Pettibone, Chester R. Davis, and Robert L. Burch, as trustees under the will of John M. Williams, deceased, and Lucille S. Williams, Chester S. Williams and Lucien M. Williams, heirs under the will of Lucien M. Williams, deceased, bring this action to recover the sums of $5,495.63 and $5,352.27, respectively, paid as taxes on certain lands, to the defendant, Cook County, Minnesota.

The above-named plaintiffs, as well as their respective decedents, are and were residents of the State of Illinois, and the defendant Cook County is and was one of the counties of the State of Minnesota, duly organized and existing as a public corpora-

tion under the laws of that State. The northern boundary of said county at the point here in controversy is co-extensive with the boundary between the United States and Canada.

To understand the basis of this action, it is necessary to have in mind the history of this portion of the boundary between the United States and the Dominion of Canada.

The boundary between the United States and Canada at this point is as ancient as any other portion of the boundary between these two sovereigns. Although it had never been surveyed or monumented, this portion of the boundary was defined and established originally in the Treaty of Paris, of 1783 (8 Stat. 80), which provided, in Article II: "* * * that all disputes which might arise in future, on the subject of the boundaries of the said United States, may be prevented, it is hereby agreed and declared, that the following are, and shall be their boundaries, viz. * * * thence through lake Superior northward of the isles Royal and Phelipeaux, to the Long Lake; thence through the middle of said Long Lake, and the water-communication between it and the Lake of the Woods, to the said Lake of the Woods; * * *".

The Treaty of Ghent, in 1814 (8 Stat. 218), provided for the appointment of commissioners to designate the boundary between the United States and Canada as fixed by the aforesaid Article II. In accordance with this treaty, commissioners were appointed to survey and designate the boundary between the two countries. These commissioners, however, were unable to agree on the location of the boundary between a point in Lake Superior to the north of Isle Royal, to the Chaudiere Falls in Lac La Pluie (Rainy Lake). The cause of this disagreement, as shown by the report of the American Commissioner in 1826, was the passing out of existence, by those names, of Isle Phelipeaux and Long Lake. The American Commissioner thought that by Long Lake was meant Dog Lake, which discharged into Lake Superior through the River Kamanistiquia, north of Isle Royal, while the British Commissioner was of the opinion that by Long Lake was meant the mouth of the St. Louis River. The American Commissioner was willing to relinquish his favored route if the British Commissioner would run the line from the mouth of the Pigeon River (which happened to coincide with the location of Long Lake on Mitchell's Map of North America), but the British Commissioner would come no closer than six miles south of the Pigeon River.

The boundary between these points remained in dispute until the Webster-Ashburton Treaty was negotiated in 1842 (8 Stat. 572). In this treaty it was agreed that the Pigeon River route should constitute the boundary between the points in dispute. A part of this route runs through Lake Saganaga. In his correspondence with Webster, preceding the adoption of this treaty, Lord Ashburton proposed that a line evidencing the boundary between the two countries be drawn on the partially completed maps and charts of the commissioners under the Treaty of Ghent. However, this was not done. Webster and Ashburton, in fact, marked such a boundary on the 1826 (commissioners') chart of Saganaga Lake, and authenticated it with their signatures, but, for some reason, this chart was never made a part of the treaty, nor was any reference thereto made therein. This chart shows the islands which are the subject of this action to be in Canada.

On or about February 1, 1879, there was made, approved and filed in the General Land Office, an official government survey and plat of the public lands claimed by the land commissioners to lie within the boundaries of the United States and within Cook County, Minnesota. This survey was one made by the United States alone, and was not a joint survey by the two countries. Included in this plat were a number of islands lying near the easterly end of Big Saganaga Lake, which were designated as Government Lot 1 in Section 29, Lot 1 in Section 31, Lots 1, 2, 3, 4, 6, 7, 8 and 11 in Section 32, and Lots 1 and 2 in Section 33, all in Township 67 North, Range 4, West of the Fourth Principal Meridian, in Cook County, Minnesota. The taxes on these lands are here in controversy.

Subsequently, on September 15, 1884, the United States issued a patent in and by which the United States purported to convey the above-described lands to one John H. Ferry. The above-named patentee, by deeds joined in by his wife, purported to convey an undivided one-half interest in these lands to John M. Williams, the above-named decedent, on July 2, 1888, and an undivided one-half interest to Lucien M. Williams, the above-named decedent, on January 8, 1903.

The final step in the location of the boundary between the two countries was taken in 1908, when the Root-Bryce Treaty

was entered into. By this treaty, each of the governments was required to appoint a commissioner, and these commissioners were to locate and monument the international boundary as described in the treaties of 1783 and 1842. In part, this treaty read: "* * * The line so defined and laid down shall be taken and deemed to be the international boundary as defined and established under the aforesaid treaties from the mouth of the Pigeon River to the northwesternmost point of the Lake of the Woods." 35 Stat. 2009, art. 5.

In accordance with this treaty, commissioners were appointed and a joint survey of the boundary was made. There was no cession of territory by virtue of this treaty, but the lands were merely located in respect to which country they belonged. Following this survey, and based thereon, the United States made and filed, on August 15, 1934, in the General Land Office, an official supplemental government plat of the above-described lands, showing that these lands were within the boundaries of the Dominion of Canada.

Taxes had been levied and collected on these lands since 1888, when they were first assessed for taxation purposes. The taxes were paid for each respective year, either by the above-named decedents or their respective executors, trustees or heirs of their respective estates, up to the time of the filing of this supplemental plat in 1934. Specifically, the last payment by the trustees under the will of John M. Williams, deceased, being in the sum of $385.74, was made on May 31, 1933, and the last two payments made by the executors of the will, or the heirs of Lucien M. Williams, deceased, in the sums of $385.54 and $379.-10, were made respectively on May 31, 1933, and July 17, 1934. The lands, during the entire time the so-called taxes were assessed thereon, were vacant and unimproved, and no public roads or improvements were ever made thereon.

This suit is brought to recover from the defendant the total amount of the payments made by the plaintiffs and their predecessors, to the County of Cook, as and for taxes on said lands, and was commenced on May 31, 1939.

The brief historical review hereinbefore set forth shows that the final agreement arrived at by Great Britain and the United States, and the boundary established in accordance therewith, did not comprehend a cession of territory on the part of either the United States or Great Britain. The final agreement cannot be construed as a correction of the boundary line. It must be held an establishment and location of the true boundary between the two nations. The United States had, by the surveys made by the General Land Office and the plat filed in said office, inadvertently extended the boundary line too far north, and by reason thereof, exercised jurisdiction over the lands involved in this suit. The United States, to the extent of issuing patents to said lands, and the County of Cook, in the State of Minnesota, by placing said lands on the assessment lists and tax rolls of that county, and collecting taxes from the reputed owners of said lands, were attempting to exercise jurisdiction over lands without the dominion of United States. It is true that the representatives of the two nations contended for different lines, evidencing their respective conclusions as to the location of the true boundary line under the treaties of 1814 and 1842, but it was not until the treaty of 1908 (Root-Bryce Treaty) that there was provided a manner and way in which the true boundary line could be established and run, and accordingly, the survey provided for under this last-mentioned treaty was for the purpose of establishing and marking the true boundary line. No stipulation or provision was made in this last-mentioned treaty, nor any of the prior treaties, with reference to private titles to any part of the property over which the United States or Great Britain may have exercised their respective sovereignties, and which might, by the last survey, be ascertained to be a part of the dominion of the other country. The United States had no title to the lands referred to herein, and her patents granted nothing to the patentees. Her exercise of sovereignty thereover was not founded on valid right, so the State and the County of Cook, in exercising their taxing powers upon said lands, had no support in law, and no support whatsoever, save and except the sovereignty's possession, and this may not be held to be a valid basis for tax purposes. Boundary locations and disputes belong to the sovereign power of the nation, and are not for a state, county or taxpayer to determine. See Coffee v. Groover, 123 U.S. 1, 8 S.Ct. 1, 31 L.Ed. 51.

The plaintiffs contend (1) that their right of action for the recovery of the payments made to the County of Cook as and for taxes did not accrue until August 15, 1934, the

date upon which the General Land Office's corrective plat and survey was filed; (2) that the money paid to the County of Cook was paid under a mutual mistake of fact, that the payments were involuntary, and therefore can be recovered.

On the other hand, it is the contention of the defendant (1) that no cause of action accrues for the recovery of the amounts paid as and for taxes until the statutory or administrative remedies have been exhausted; (2) that each payment alleged in the complaint is an independent transaction, and that the statute of limitations commences to run from the date of each payment; (3) that the payments were made voluntarily, under no mistake of fact and cannot be recovered.

It is the claim of the defendant that as a prerequisite to the maintenance of this action, the plaintiffs must first make application to the Minnesota Tax Commission for a refund of the taxes paid (Section 1983, Mason's Minnesota Statutes 1927). However, this claim does not merit serious consideration. Plaintiffs are not here seeking to recover taxes, but rather, exactions which they contend they were required to pay under the guise of taxes; nor are they seeking to recover under any of the provisions of the taxing statutes, but base their action on the ground that the defendant has in its possession, or in any event, has received, money from the plaintiffs belonging to them, which they have been wrongfully and illegally forced to pay. It is an action in form for money had and received. The pretended tax on the lands was void and of no effect; the land, not being in the United States, could not be subjected to any tax imposed by the State of Minnesota or any of its political subdivisions. The moneys received by the county as and for payment of the so-called taxes were, in reality, collected and received by the defendant without authority or basis in the law, and that being so, the plaintiffs are not required to resort to the administrative proceedings authorized in cases where application for refund or abatement of taxes is contemplated.

The parties are in agreement that each payment constituted a separate transaction. The defendant argues that the statute of limitations commenced to run from the date of each payment, while the plaintiff urges that in determining the time within which an action may be brought, consideration must be given to Section 9185, Mason's Minnesota Statutes 1927, which in part provides: "Actions can only be commenced within the periods prescribed in this chapter, after the cause of action accrues * * *."

Section 9191, Mason's Minnesota Statutes 1927, provides in substance that actions upon a contract or other obligation, express or implied, as to which no other limitation is expressly prescribed, shall be commenced within six years. This suit was commenced on May 31, 1939, and more than six years have elapsed since any payment was made by the plaintiffs to the defendant, save and except as to three payments.

The plaintiffs earnestly contend that their causes of action did not accrue as to any of the payments in question until August 15, 1934, the date upon which the Land Office's corrective survey and plat was filed. Until that time the original plat and survey could not be challenged save by direct action by the government itself.

The general rule is that statutes of limitation commence to run when the right of action is complete; that is, when it has accrued in shape to be enforced, when the plaintiff can bring his action. Amy v. Dubuque, 98 U.S. 470, 25 L.Ed. 228.

The plaintiffs claim further that if they brought an action to recover the amount of these payments prior to 1934, they would have been confronted with the insurmountable barrier of the first Land Office survey, which showed that the lands referred to herein and upon which taxes were assessed were located in Cook County; that the Land Office's determination of fact could not previous to August, 1934, be questioned or impeached in a collateral proceeding.

Section 2, Title 43, U.S.C.A., provides that the Commissioner of the General Land Office shall perform, under the direction of the Secretary of the Interior, all executive duties pertaining to the survey and sale of public lands of the United States. It is a well-established rule of law that whether a survey of public lands as originally made by the General Land Office is correct is a matter exclusively for that office, but "where the lines run by such survey lie on the ground, and whether any particular tract is on one side or the other of that line, are questions of fact which are always open to inquiry in the courts". Russell v. Maxwell Land Grant Company,

158 U.S. 253, 259, 15 S.Ct. 827, 830, 39 L.Ed. 971.

■■■ There is no question as to the principle of law that when the officers of the General Land Office have issued a patent regular and sufficient to convey title to the land described in it, such patent is immune from collateral attack. However, at all times, inquiry is open as to whether the officers had lawful authority to issue such patent. If the officers acted without authority of law, or if the land purported to be patented and conveyed had never been within their control, or had been withdrawn from their control before they undertook to exercise the authority which they had over it, then their act would be void for want of power in them, and power to act over the subject matter. Their act would not be merely voidable, but absolutely void. If the acts were only voidable and the patent were questioned, a direct attack on the patent in a court of equity would be required, but when the acts are void because of a want of jurisdiction over the land the invalidity of the patent may be shown by extrinsic evidence in a suit at law. Doolan v. Carr, 125 U.S. 618, 625, 8 S.Ct. 1228, 31 L.Ed. 844.

In Polk v. Wendal et al., 9 Cranch, 87, 99, 3 L.Ed. 665, Chief Justice Marshall, speaking for the court, said: "In the general, then, a Court of equity is the more eligible tribunal for these questions; and they ought to be excluded from a Court of law. But there are cases in which a grant is absolutely void; as where the state has no title to the thing granted; or where the officer had no authority to issue the grant. In such cases, the validity of the grant is necessarily examinable at law."

The Supreme Court, on another occasion, in considering the question of the immunity of a land patent from collateral attack, said, in the case of St. Louis Smelting Company v. Kemp, 104 U.S. 636, on page 641, 26 L.Ed. 875: " * * * when we speak of the conclusive presumptions attending a patent for lands, we assume that it was issued in a case where the department had jurisdiction to act and execute it; that is to say, in a case where the lands belonged to the United States, and provision had been made by law for their sale. If they never were public property, or had previously been disposed of, or if Congress had made no provision for their sale, or had reserved them, the department would have no jurisdiction to transfer them, and its attempted conveyance of them would be inoperative and void, no matter with what seeming regularity the forms of law may have been observed. The action of the department would in that event be like that of any other special tribunal not having jurisdiction of a case which it had assumed to decide. Matters of this kind, disclosing a want of jurisdiction, may be considered by a court of law."

See, also, Crowell v. Benson, 285 U.S. 22, 59, 52 S.Ct. 285, 76 L.Ed. 598; Borax Consolidated, et al., Ltd. v. Los Angeles, 296 U.S. 10, 18, 56 S.Ct. 23, 80 L.Ed. 9.

■■ A Land Office plat and a patent stand in the same light before the law. They are both records of the General Land Office, and what has been said hereinbefore as to the circumstances under which a patent issued by the United States may be questioned, is likewise applicable to Land Office surveys and plats. The first survey of the General Land Office was at all times subject to collateral attack, since the property to which the plaintiffs and their predecessors claimed title, and upon which they paid the so-called taxes, were never "public lands of the United States", and were no part of the public domain of this nation; therefore, any act of the Land Office in respect thereto was void. True, no one knew the correct location of the international boundary until the year 1929, but the location and survey in that year by the boundary commissioners definitely established that line.

■■ The convention, or treaty, of 1908 (35 Stat. 2003) is a public statute, and was so proclaimed by the President of the United States on July 1, 1908. This treaty provided for the appointment of a commission, representatives of both governments, which was required and directed to locate on the ground and water the international boundary, as described in the treaties of 1783 and 1842. The convention of 1908 was self-executing from and after its ratification. It required no further action on the part of Congress. Article V thereof provided that when agreement was reached between the respective commissioners as to the boundary line, "The line so defined and laid down shall be taken and deemed to be the international boundary as defined and established under the aforesaid treaties from the mouth of Pigeon River to the northwesternmost point of the Lake of the Woods".

The plaintiffs must be deemed to have had knowledge of this public act, but further than that it was common knowledge, at least to all persons having any slight acquaintance with the history of the boundary between Canada and the United States, that the true boundary between said nations was a matter of dispute. The plaintiffs say that they did not have the available evidence to sustain proof that the lands were without the United States until the filing of the corrected Land Office plat. It cannot be successfully maintained that availability of evidence is determinative of the time when an action accrues. Even though that were a principle of law, it appears that the plat prepared by the commissioners under the convention of 1908 was signed March 28, 1929, and the legend, "Date of Publication, 1929" appears thereon. (See Plaintiff's Exhibit H.)

The plaintiffs, in their reply brief, concede that the commissioners made their report and concluded their duties in the year 1931. In any event, evidence was available to the plaintiffs at least as early as the year 1931 to sustain proof that the lands which were taxed by the County of Cook were in fact not within the United States, but within the Dominion of Canada.

■ I am mindful of a stipulation of facts in this case to the effect "neither the plaintiffs or their predecessors in title * * * nor the defendant had any actual knowledge or means of knowledge of the location of the boundary line between the United States and Canada as so surveyed, designated and monumented by said Commissioners" until the making and filing of this supplemental plat in 1934. The supplemental plat referred to therein is the Land Office plat, or map. This stipulation, as to what the ultimate facts in the case are, rises to no greater dignity than other evidence received at the trial. Further than that, it states a conclusion which is in conflict with the evidence. The plaintiffs had constructive notice of the making of the survey, and the final determination of the location of the international boundary line contemplated in the convention of 1908 as early as the year 1929, and in any event, had such knowledge by 1931. The plaintiffs had the means of acquiring knowledge of the true boundary line, as located thereunder through inquiry at the State Department.

Summarizing, the first survey of the Land Office was not immune from attack in a collateral proceeding, the lands under consideration not being at any time a part of the public domain of this nation, but was subject to successful attack at any time from and after March 28, 1929. The causes of action, on all payments made by plaintiffs to the defendant, save and except the two payments made in 1933, and the one in 1934, accrued more than six years prior to the institution of this action, and recovery thereon is barred by the statute of limitations.

Since it is my conclusion that the causes of action accrued, at a date not later than the year 1931 on all payments save and except as to the three payments which have been specifically referred to, the question then arises as to whether these three payments, the same having been made within six years previous to the institution of this action, were voluntary or involuntary.

■ The rule is well established that voluntary payments cannot be recovered. Just as well established is the rule that payments made under a mistake of fact are not voluntary payments. Wheeler v. Board of Commissioners, 87 Minn. 243, 91 N.W. 890.

■ The mere fact that taxes were illegal does not make the payment thereof involuntary. Taxes paid under a mistake of law cannot be recovered. See Falvey v. Board of Commissioners, 76 Minn. 257, 79 N.W. 302.

In determining the question as to whether or not these taxes were paid under a mistake of fact, we will be aided by having in mind a sound definition thereof. One of the most common definitions of this term is found in Words and Phrases, and is as follows: "* * * a mistake not caused by the neglect of a legal duty on the part of the person making the mistake". Words and Phrases, 5th Series, page 22.

The Minnesota Supreme Court, in the case of Grant et al. v. Bibb et al., 129 Minn. 312, 152 N.W. 728, 729, stated: "Ignorance of one put upon inquiry, due to his failure to inquire, is not mistake."

In Walser v. Board of Education, 160 Ill. 272, 43 N.E. 346, 31 L.R.A. 329, certain lands in School District No. 2 were, by reason of the mistake of the county clerk of Cook County, Illinois, assessed for taxes of School District No. 1. These taxes were paid by the taxpayers under the supposition that they were paying the tax for

888

School District No. 2. In an action to recover these taxes, it was held, it appearing that the books were open to inspection by the taxpayers, and that the means of knowledge existed to learn and know all the facts, that the money was paid voluntarily by these taxpayers who had knowledge of, or the means of acquiring knowledge of, all of the facts, and that the action could not be maintained to recover said money.

In the instant case, the treaty of 1908 gave notice to the plaintiffs that the boundary adjacent to these lands was unsettled, and that there was dispute with reference to the true location thereof. Further than that, the treaty was a public statute, and all persons were charged with notice thereof. The plat made by the commissioners was filed in the Secretary of State's office in March, 1929.

The plaintiffs concede in their brief that the Commission made its final report and concluded its duties as such Commission, in 1931. It cannot be successfully maintained that the plaintiffs and their predecessors might close their eyes to all of these facts. The plaintiffs had the opportunity and means of acquiring full and complete information as to the location of their claimed properties. A simple inquiry addressed to the Secretary of State's office would, no doubt, have brought to them correct information with reference to the location of these properties. The plaintiffs took no steps along that line, so far as the record discloses. They were content to make the so-called tax payments, in 1933, and one in 1934. Under the circumstances, where no effort was made by these plaintiffs to gain information which was available to them, and which they had good reason to believe existed, they cannot now be permitted to say that the last three payments were involuntary. There is no element of duress. Plaintiffs and their predecessors should have had no concern as to any personal liability by reason of a failure to pay real estate taxes. Real estate "taxes do not constitute a liability against the person of the owner of the property, but merely a claim against the land". Falvey v. Board of Commissioners, supra. The court is of the opinion that these payments were voluntary, and therefore the same cannot be recovered in this proceeding.

Because of the foregoing conclusions reached by the court, which are determinative of this lawsuit, there is no occasion for a discussion of the other questions raised by the respective parties, although due consideration has been given to them.

Findings of fact and conclusions of law in accordance herewith may be presented upon five days' notice, on or before April 15th, 1940.