# PETTIBONE et al. v. COOK COUNTY, MINNESOTA.

## No. 11847.

Circuit Court of Appeals, Eighth Circuit.

June 16, 1941.

John D. Jenswold, of Duluth, Minn., and Charles Wangensteen, of Chisholm, Minn. (Austin & Wangensteen, of Chisholm, Minn., and Jenswold & Dahle, of Duluth, Minn., on the brief), for appellants.

George B. Sjoselius, Sp. Asst. Atty. Gen., of Minnesota (J. A. A. Burnquist, Atty. Gen. of Minnesota, Chester S. Wilson, Deputy Atty. Gen. of Minnesota, and E. P. J. Chapman, Cook County Atty., of Grand Marais, Minn., on the brief), for appellee.

Before SANBORN, WOODROUGH, and THOMAS, Circuit Judges.

SANBORN, Circuit Judge.

The appellants and their predecessors in interest, from 1888 to 1934, inclusive, paid to Cook County, Minnesota, the real estate taxes levied each year by that County upon certain islands in Saganaga, a boundary lake lying partly in the United States and partly in Canada. These taxes were levied by the County and were paid by the taxpayers in the belief that the islands were within the boundaries of Cook County and of the United States. In 1934 it was discovered that the islands were in Canada. On May 31, 1939, the appellants commenced this action to recover from the County approximately eleven thousand dollars which it had received as taxes upon the islands as a result of the mutual mistake as to the location of the islands. [1]

---

[1] Jurisdiction is based on diversity of citizenship. Appellants are citizens of Illinois. The appellee is a duly organized county of the State of Minnesota and a citizen of that State for purposes of jurisdiction. Mercer County v. Cowles (Cowles v. Mercer County), 7 Wall. 118, 122, 19 L.Ed. 86; Lincoln County v. Luning, 133 U.S. 529, 530, 10 S.Ct. 363, 33 L.Ed. 766; Hopkins v. Clemson Agricultural College, 221 U.S. 636, 642–646, 31 S.Ct. 654, 55 L.Ed. 890, 35 L.R.A., N.S., 243; Ward v. Board of Commissioners, 253 U.S. 17, 24, 40 S.Ct. 419, 64 L.Ed. 751; Pearl River County v. Wyatt Lumber Co., 5 Cir., 270 F. 26, 28;

The County defended upon the following grounds: (1) That appellants' cause of action with respect to payments made more than six years before the commencement of their action is barred by limitations. (2) That all payments were voluntarily made with full knowledge of the facts. (3) That the mutual mistake, if any, was one of law. (4) That the payments were for taxes levied as required by the laws of the State of Minnesota, and that the moneys received by the County were expended for governmental purposes of the State and its subdivisions and for the benefit and protection of persons and property of citizens and taxpayers, including the appellants.

The case was tried to the court without a jury. The court determined that the recovery of all payments made prior to May 31, 1933, was barred by limitations, and that payments made since that time were voluntary. From a judgment for the County, this appeal is taken.

█ While the controversy has its roots in the uncertainty which existed for many years as to the exact location of the boundary between the United States and Canada from Lake Superior to the Lake of the Woods, it is unnecessary to refer in detail to the history of the boundary. The description contained in the Treaty of Paris of 1783, 8 Stat. 80, of that portion of the boundary with which we are concerned was so vague and uncertain that the location of the boundary remained in dispute until the Webster-Ashburton Treaty of 1842, 8 Stat. 572. The boundary as determined by that treaty extended up the Pigeon River from its mouth at Lake Superior to a point once known as Fort Charlotte, beyond the Cascades, and from that point along the Pigeon River route, an old water and portage route used by the fur traders and Indians in transporting, by canoe, goods and furs to and from Grand Portage on Lake Superior to the Lake of the Woods and points north and west of that lake. See Pigeon River Improvement, S. & B. Co. v. Cox, Ltd., 291 U.S. 138, 148, 149, 54 S.Ct. 361, 78 L.Ed. 695, and footnotes 4 and 6. This was a route well known to the fur trade during the late seventeen hundreds and the early eighteen hundreds. Over it were transported furs from western Canada destined for Montreal, and trade goods from Montreal to be used in exchange for furs in western Canada. The route ran through Saganaga. Lord Ashburton and Daniel Webster, at the time the Treaty of 1842 was entered into, marked the boundary line through that lake upon a chart, and this line showed that the islands here involved were in Canada, but the chart was not made a part of the treaty by reference or otherwise, and it cannot be said that the treaty fixed the location of the boundary with respect to the islands.

The northerly boundary of Cook County coincides with the international boundary. On February 1, 1879, the United States filed an official government survey and plat showing the public lands lying within Cook County. The islands in question were shown on the plat. On September 15, 1884, the United States issued a patent for these islands to John H. Ferry. Ferry deeded an undivided one-half of them to John M. Williams in 1888, and deeded the other undivided one-half to Lucien M. Williams in 1903. The appellants are the successors in interest of said John M. Williams and Lucien M. Williams, who are now deceased. The islands have always been vacant and unimproved. They were assessed for taxation in and after 1888 by the County. From 1888 until 1934 the County each year levied and collected real estate taxes upon the islands in the same manner that it collected and levied similar taxes upon other lands in the County. The moneys received by the County from the appellants and their predecessors for taxes on the islands were paid out and distributed by the County for governmental purposes in accordance with the laws of the State of Minnesota.

The Root-Bryce Treaty of 1908 between the United States and Great Britain, proclaimed by the President on July 1, 1908, 35 Stat. 2003, provided, in Article V, for the survey, location and monumentation, by Joint Commissioners known as the

---

Board of Commissioners v. United States, 10 Cir., 100 F.2d 929, 936; City of Long Beach v. Metcalf, 9 Cir., 103 F.2d 483, 485. The immunity of a state from suit does not extend to a county. While counties, like other bodies politic "often have a defense which relieves them from responsibility where a private corporation would be liable", they are required to assert their defense. Hopkins v. Clemson Agricultural College, 221 U.S. 636, 645, 31 S.Ct. 654, 657, 55 L.Ed. 890, 35 L.R.A.,N.S., 243.

International Boundary Commission, of the international boundary from Lake Superior to the Lake of the Woods. The treaty recited that this section of the boundary line between the United States and Canada "has never been actually located or monumented along its course by joint action of the two Governments," and it was agreed that the Commissioners "shall reestablish and fix the actual location of said entire boundary * * * and designate the side of the boundary upon which each island adjacent to the boundary belongs, it being mutually understood that the boundary, so far as practicable, shall be a water line and shall not intersect islands lying along its course, * * *." Article V of the treaty then concluded: "The line so defined and laid down shall be taken and deemed to be the international boundary as defined and established under the aforesaid treaties [the Treaty of Paris of 1783, 8 Stat. 80, and the Webster-Ashburton Treaty of 1842, 8 Stat. 572] from the mouth of Pigeon River to the northwesternmost point of the Lake of the Woods." The Commissioners appointed in accordance with the terms of the Treaty of 1908 made a joint survey of the boundary, and located and monumented the boundary line. A plat showing the location of the line through Saganaga was prepared by the Commissioners and was signed by them on March 28, 1929. Over the signatures of the Commissioners appears this certificate:

"We certify that this map is one of the quadruplicate set of thirty-six (36) maps prepared under Article V of the Treaty between Great Britain and the United States of America, signed at Washington, April 11, 1908, and that we have marked hereon the Boundary Line as reestablished by the Commissioners designated above, in accordance with the provisions of the said Treaty.

"Signed March 28, 1929."

The plat was filed in the office of the Secretary of State of the United States in March, 1929. On October 27, 1931, the Commissioners concluded their duties under the treaty, and filed their report in the office of the Secretary of State. They had prior to 1930, as directed by the treaty, determined the exact location of the boundary line, and had fixed it by triangulation, traverse stations, boundary monuments, and boundary reference monuments. The plat and report filed by the International Boundary Commission with the Secretary of State showed the exact location of the boundary, and disclosed that the islands in Saganaga, here involved, were in Canada. On August 15, 1934, the United States filed in the General Land Office a supplemental government plat showing these islands to be in Canada. Cook County has received no official notification from the United States that the islands are in Canada. The appellants in 1934, while engaged in negotiations to sell the islands, learned for the first time that the islands were north of the international boundary.

The applicable statutes of limitation are Sections 9185 and 9191, Mason's Minnesota Statutes of 1927. Section 9185 provides: "Actions can only be commenced within the periods prescribed * * * after the cause of action accrues." Section 9191 provides: "The following actions shall be commenced within six years: 1. Upon a contract or other obligation, express or implied, * * *."

The appellants contend that their cause of action accrued, as to each payment, on May 31, 1939, when they first demanded the return of their payments by commencing suit against the County, and that their right to a recovery could not, in any event, have accrued prior to 1934, when the supplemental government plat showing these islands to be in Canada was filed in the General Land Office of the United States. The County contends that the cause of action for the recovery of each payment accrued on the day the payment was made, and that, if this is not so, the cause of action of the appellants accrued not later than October 27, 1931, when the International Boundary Commission made its final report to the Secretary of State of the United States, because the appellants were then charged with knowledge that the islands were in Canada.

The court below found that from and after October 27, 1931, the date when the report of the International Boundary Commission was filed with the Secretary of State of the United States, the appellants had available to them the means of ascertaining the location of the islands, and ruled that they on October 27, 1931, and thereafter had constructive notice of the contents of the report and of the fact that the islands were in Canada; that their cause of action accrued on October 27, 1931; that the recovery of all payments made prior to May 31, 1933, was

barred by limitations; and that payments made on and after that date could not be recovered because they were voluntary.

 We do not agree with the appellants that their cause of action did not accrue until they made a demand upon the County. . A cause of action accrues at the time when an action thereon can be commenced.[2] We think that at least as soon as the. fact that the islands were in Canada was demonstrable, the appellants' cause of action accrued, because they could then have successfully maintained an action thereon without making any demand, since that was not an element of their cause of action and, we think, was not even a step in their remedy.[3] That appellants, in order to require the County to pay interest upon the payments sought to be recovered, would have been required to make a demand,[4] does not demonstrate that a demand was an essential element of their cause of action. The fact that they remained in ignorance of the existence of their cause of action after it had actually accrued did not toll the statutes of limitation.[5]

Whether the statutes of limitation commenced to run against the recovery by appellants of each yearly payment at the time it was made, as is contended by the County, is a more doubtful question. The statutes of Minnesota do not provide that a cause of action based upon mistake shall be barred six years after the mistake is discovered or is discoverable, and, technically, no doubt, one who pays money by mistake has immediately a cause of action for its recovery, even though the mistake be unknown and unknowable. We quote the following from 34 Am.Jur. 139, § 174:

"In equity, where correction of a mistake is sought, the statute does not begin to run on the cause of action until the time when the mistake is discovered, or, at any rate, until the time when, by the use of due diligence, it ought to have been discovered. In actions at law, however, there is a difference of opinion; according to some courts, a cause of action at law, based upon mistake, does not accrue until the mistake is discovered or should have been discovered by the exercise of reasonable diligence, while others take the view that in an action at law to recover money paid by mutual mistake, in the absence of any fraudulent concealment, the statute begins to run from the time of payment unless there is a contrary provision in the limitation statute, as is the case in some jurisdictions where the statutes of limitation by their terms do not begin to run until the mistake is discovered."

It cannot be said with certainty that the Supreme Court of Minnesota would not, under the circumstances, rule that the statutes of limitation ran against the appellants' right of recovery as to each payment from the time it was made and that all payments made more than six years before May 31, 1939, were therefore irrecoverable. It is so clear, however, that the appellants had, prior to the time that the boundary was definitely located, nothing which could properly be called a maintainable cause of action that we think the court below was justified in ruling that the statutes ran from the time the mistake as to the location of the islands became ascertainable.

 It is certain that the location of the international boundary adjacent to the islands has become fixed by treaty. The Treaty of 1908 had the force and effect of law. By Article VI, clause 2, of the Constitution of the United States, treaties are "the supreme Law of the Land". A treaty has the same force and effect as an act of legislation whenever the treaty operates of itself without legislative pro-

[2] Ganser v. Ganser, 83 Minn. 199, 86 N.W. 18, 85 Am.St.Rep. 461; State v. Tupa, 194 Minn. 488, 260 N.W. 875, 99 A.L.R. 147; Dunnell's Minn. Dig., 2nd Ed., § 5602.

[3] Weston v. Jones, 160 Minn. 32, 199 N.W. 431; Swing v. Barnard-Cope Mfg. Co., 115 Minn. 47, 131 N.W. 855; I. L. Corse & Co. v. Minnesota Grain Co., 94 Minn. 331, 102 N.W. 728; Village of Glencoe v. County of McLeod, 40 Minn. 44, 41 N.W. 239; Branch v. Dawson, 33 Minn. 399, 23 N.W. 552; Ford v. Brownell, 13 Minn. 184, 13 Gil. 174; Leather Manufacturers' Bank v. Merchants' Bank,

128 U.S. 26, 9 S.Ct. 3, 32 L.Ed. 342; 34 Am.Jur. 97-98, §§ 117, 118; 21 R.C.L. 178, § 213; 37 C.J. 859, 860, § 224; Minnesota Law Review, Vol. XX, page 483.

[4] Sibley v. County of Pine, 31 Minn. 201, 17 N.W. 337; I. L. Corse & Co. v. Minnesota Grain Co., 94 Minn. 331, 102 N.W. 728.

[5] Weston v. Jones, 160 Minn. 32, 199 N.W. 431; Township of Normania v. County of Yellow Medicine, 205 Minn. 451, 457, 286 N.W. 881; Minnesota Law Review, Vol. XX, page 483.

visions.[6] All persons are conclusively presumed to know the law.[7] Just when the international boundary became definitely fixed by treaty is not so certain. It may have been in 1929 when the plat was filed with the Secretary of State, or in 1931 when the report of the Commissioners was filed. See and compare, San Lorenzo Title & Improvement Co. v. City Mortgage Co., 124 Tex. 25, 73 S.W.2d 513. The appellants contend that, although the terms of the Treaty of 1908 were fully executed by the International Boundary Commission by October 27, 1931, and although the boundary was then located and monumented by the Commission and was by the terms of the Treaty of 1908 to be taken and deemed to be the international boundary as defined in the Treaties of 1783 and 1842, their cause of action did not accrue in 1931 against the County, because the Treaty of 1908 was not self-executing so far as the appellants were concerned, and that, until the boundary as located by the Commission was accorded recognition by the General Land Office in 1934, the appellants could not successfully have maintained this action. This is equivalent to saying that, although the boundary had been located by law so far as the parties to the Treaty of 1908 were concerned, the islands, supposedly conveyed by the United States to Ferry and shown by the plat of the General Land Office filed in 1879 to be in the United States, were judicially to be regarded, so far as appellants are concerned, as being in the United States until the Land Office filed its supplemental plat in 1934.

 It is our opinion that when it was established by the Treaty of 1908 and the proceedings of the International Boundary Commission thereunder, that the islands in suit were in Canada, it conclusively appeared that the patent issued by the United States in 1884 to Ferry was utterly void, and that the plat filed by the General Land Office, upon which the County relied in levying taxes upon the islands, was, so far as it indicated that these islands were within the United States, equally void and ineffective. The authority of the Commissioner of the General Land Office is limited to dealing with public lands of the United States. 43 U.S.C.A. § 2. Canadian islands are not public lands of the United States. The rule that decisions of the General Land Office are unassailable by the courts except in a direct proceeding relates only to matters within the jurisdiction of the Land Department, and not to matters relating to lands which are not public lands of the United States. See and compare Borax Consolidated, Ltd. v. Los Angeles, 296 U.S. 10, 16–19, 56 S.Ct. 23, 80 L.Ed. 9.

 We think that when the International Boundary Commission had completed its work and filed its plat and its report with the Secretary of State of the United States, the international boundary, as surveyed, located and monumented by it, became fixed as a matter of law, and this not later than October 27, 1931. We also think that the appellants were then charged with knowledge of the location of the boundary, and that their right of action against Cook County for the moneys which had been collected by it for taxes upon these islands accrued. This ruling, under the circumstances of this case, may seem harsh, since it is obvious that little or no publicity was given to the plat · and report of the International Boundary Commission. The County had no more knowledge of the report of the Commission than had the appellants. However, the appellants by 1934 did learn that the islands were in Canada, and waited nearly five

---

6 United States v. The Schooner Peggy, 1 Cranch 103, 2 L.Ed. 49; Foster v. Neilson, 2 Pet. 253, 7 L.Ed. 415; United States v. De la Maza Arredondo, 6 Pet. 691, 8 L.Ed. 547; Strother v. Lucas, 12 Pet. 410, 9 L.Ed. 1137; United States v. D'Auterive, 10 How. 609, 13 L.Ed. 560; Haver v. Yaker, 9 Wall. 32, 19 L.Ed. 571; Head Money Cases, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798; Whitney v. Robertson, 124 U.S. 190, 8 S.Ct. 456, 31 L.Ed. 389; Ex parte Cooper, 143 U.S. 472, 12 S.Ct. 453, 36 L.Ed. 232; Valentine v. United States, 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5.

7 United States v. Hodson, 10 Wall. 395, 409, 19 L.Ed. 937; Upton v. Tribilcock, 91 U.S. 45, 50, 23 L.Ed. 203; The Floyd Acceptances, 7 Wall. 666, 682, 19 L.Ed. 169; Mammoth Oil Co. v. United States, 275 U.S. 13, 54, 48 S.Ct. 1, 72 L.Ed. 137; Wilber Nat. Bank v. United States, 294 U.S. 120, 123–124, 55 S.Ct. 362, 79 L.Ed. 798; Minneapolis Brewing Co. v. Village of Bagley, 142 Minn. 16, 19, 170 N.W. 704, 705; Minnesota Canal & Power Co. v. Pratt, 101 Minn. 197, 231, 232, 112 N.W. 395, 405, 11 L.R.A., N.S., 105.

years thereafter before commencing this action.

█ It was stipulated in the court below that prior to August 15, 1934, "neither the plaintiffs or their predecessors in title * * * nor the defendant had any actual knowledge or means of knowledge of the location of the boundary line between the United States and Canada as so surveyed, designated and monumented by said Commissioners" [31 F.Supp. 881, 887], and as shown by the supplemental government plat filed by the General Land Office on August 15, 1934. The appellants contend that, in view of this stipulation, it cannot be ruled that they were charged with knowledge on October 27, 1931, that the islands were in Canada. This stipulation cannot control the legal effect of the admitted facts or enable the appellants to avoid the legal consequences of the Treaty of 1908 and the proceedings of the Commissioners thereunder. [8]

█ The question remains as to whether payments made on and after May 31, 1933, were voluntary. "It is a general rule that money voluntarily paid, with full knowledge of the facts, cannot be recovered back, though the claim on which the payment was made was illegal." § 7461, Dunnell's Minn. Digest. "If a man chooses to give away his money, or to take his chances whether he is giving it away or not, he cannot afterwards change his mind; but it is open to him to show that he supposed the facts to be otherwise, or that he really had no choice." Joannin v. Ogilvie, 49 Minn. 564, 566, 52 N.W. 217, 16 L.R.A. 376, 32 Am.St.Rep. 581. This general rule applies to the voluntary payment of taxes without compulsion or duress. [9] One exception to the rule is where the taxpayer is excusably ignorant of a material fact and there is legal justification for ordering his reimbursement. [10] While the appellants were ignorant of the location of the international boundary after October 27, 1931, we have ruled that they were conclusively presumed to know its location at and after that date. Therefore the rule relating to voluntary payments is applicable here. [11]

[8] See and compare Swift & Co. v. Hocking Valley Ry. Co., 243 U.S. 281, 289, 37 S.Ct. 287, 61 L.Ed. 722; Estate of Sanford v. Commissioner, 308 U.S. 39, 51, 60 S.Ct. 51, 84 L.Ed. 20; Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 114, 60 S.Ct. 1, 84 L.Ed. 110; Utah & Northern Ry. v. Fisher, 116 U.S. 28, 33, 6 S.Ct. 246, 29 L.Ed. 542.

[9] Where the money or property of another is received by a county in discharge of a tax obligation, irrespective of whether it was legally or illegally imposed, it is the settled rule in Minnesota that if the sums are paid without coercion or imposition they are deemed voluntarily paid and are not recoverable. Braddock Iron Mining Co. v. Erskine, 155 Minn. 70, 192 N.W. 193; Fry v. County of Morrison, 136 Minn. 225, 161 N.W. 511; Gould v. Board of County Commissioners, 76 Minn. 379, 79 N.W. 303, 530; Hofflin v. Board of County Commissioners, 80 Minn. 190, 83 N.W. 29; Falvey v. Board of County Commissioners, 76 Minn. 257, 79 N.W. 302; American Baptist Missionary Union v. Hastings, 67 Minn. 303, 69 N.W. 1078; DeGraff v. County of Ramsey, 46 Minn. 319, 48 N.W. 1135; State v. Nelson, 41 Minn. 25, 42 N.W. 548, 4 L.R.A. 300; Shane v. City of St. Paul, 26 Minn. 543, 6 N.W. 349; Smith v. Schroeder, 15 Minn. 35, 15 Gil. 18.

A somewhat different rule is applied to the voluntary payment of special assessments, when the money paid is not expended for the purposes for which the assessments were collected. The public corporation which has received payments of assessments then stands "in the position of holding in its treasury money collected from the" taxpayer "which it has no right in equity, good conscience, or common honesty to retain," (Valentine v. City of St. Paul, 34 Minn. 446, 448, 26 N.W. 457, 458) and recovery is allowed. Valentine v. City of St. Paul, 34 Minn. 446, 26 N.W. 457; Strickland v. City of Stillwater, 63 Minn. 43, 65 N.W. 131; McConville v. City of St. Paul, 75 Minn. 383, 77 N.W. 993, 43 L.R.A. 584, 74 Am.St.Rep. 508; Fry v. County of Morrison, 136 Minn. 225, 161 N.W. 511; Sloan v. City of Duluth, 194 Minn. 48, 259 N.W. 393. Contra: Horn v. City of Minneapolis, 182 Minn. 172, 234 N.W. 289; Hunter v. City of Minneapolis, 171 Minn. 309, 213 N.W. 916.

[10] Wheeler v. Board of County Commissioners, 87 Minn. 243, 91 N.W. 890; Fry v. County of Morrison, 136 Minn. 225, 161 N.W. 511; Gould v. Board of County Commissioners, 76 Minn. 379, 79 N.W. 303, 530; Falvey v. Board of County Commissioners, 76 Minn. 257, 79 N.W. 302; Joannin v. Ogilvie, 49 Minn. 564, 52 N.W. 217, 16 L.R.A. 376, 32 Am.St.Rep. 581.

[11] Gould v. Board of County Commissioners, 76 Minn. 379, 79 N.W. 303, 530; Hofflin v. Board of County Commissioners, 80 Minn. 190, 83 N.W. 29; Fry v.

If we are correct in our views that the location of the boundary was fixed by law in 1931 and that the appellants were charged with knowledge of its location, then this case is ruled by Minneapolis Brewing Co. v. Village of Bagley, 142 Minn. 16, 170 N.W. 704. The village had collected license fees for liquor licenses, which, because of an old and apparently forgotten Indian treaty, the village could not lawfully grant. At a village election the licenses were annulled, but not because of the treaty. The village thereafter issued warrants to the holders of the licenses for the unearned portion of the license fees paid. They assigned the warrants to the Brewing Company. The Brewing Company brought suit upon the warrants, and the village defended upon the ground that its attempted refundment of fees was void. The Supreme Court of Minnesota pointed out that the proceeding by which the licenses were granted by the village was a voluntary matter and that the payment of the license fees was voluntary; that the fees passed into the village treasury and were subsequently devoted to the purposes of the municipality. The court said (142 Minn. at page 19, 170 N.W. at page 705):

"It is well-settled law that where license fees are paid voluntarily by the applicant for a license, without mistake of fact, the municipality receiving the same, in the absence of a statute otherwise providing, is not liable for a return of the money, even though exacted under an unconstitutional statute, or otherwise be not a legal demand. * * * The fact that there may be a moral obligation supporting the claim does not change the rule. The money in such case after reaching the public treasury can be withdrawn only when legislative authority exists therefor, and considerations of a moral character should be addressed to that department of state affairs. Such is the law of this state. Erkens v. Nicolin, 39 Minn. 461, 40 N.W. 567. And legislative relief has often been granted in furtherance of substantial justice. Bowen v. [City of] Minneapolis, 47 Minn. 115, 49 N.W. 683, 28 Am.St. Rep. 333; Calderwood v. Jos. Schlitz Brewing Co., 107 Minn. 465, 121 N.W. 221; Chapter 109 [p. 126], G.Laws 1913; chapter 306 [p. 438], G.L.1913. There was

no mistake of fact in this case. The treaty was notice to all concerned. It may have been unknown in fact, but that does not relieve the situation as a matter of law."

The claim of the County that it is excused from refunding the money of the appellants because of its changed financial condition, because it has expended the money with other tax money for governmental purposes, and because it furnished governmental protection to these Canadian islands, requires no comment.

We reach the same conclusions as were reached by the court below, namely, that the appellants brought their action too late to recover payments made prior to May 31, 1933, and that payments made on and after that date could not be recovered because they were voluntary.

The judgment appealed from is affirmed.

---

County of Morrison, 136 Minn. 225, 161 N.W. 511; Minneapolis Brewing Co. v. Village of Bagley, 142 Minn. 16, 170 N.

W. 704. Compare, Wheeler v. Board of County Commissioners, 87 Minn. 243, 91 N.W. 890.