DELAWARE REGISTRATION TRUST COMPANY, a corporation of the State of Delaware,

*vs.*

DELAWARE FORGE AND STEEL COMPANY, a corporation of the State of Delaware.

In the Matter of the Petition of Joshua Ernest Smith.

*New Castle, July 27, 1927.*

*Charles W. Smith* and *Thomas M. Keith*, for Joshua Ernest Smith, petitioner.

*Caleb S. Layton*, City Solicitor, for Mayor and Council of Wilmington.

THE CHANCELLOR. The controversy which the rule presents involves the validity of the city's claim for unpaid taxes. The precise question is whether the lands of the defendant which were sold in foreclosure proceedings were during the years 1920 to 1926, inclusive, exempt from municipal taxation under the provisions of *Chapter* 106, *Vol.* 21, *Laws of Delaware*, approved May 20, 1898.

The lands, now lying within the corporate limits of Wilmington, embrace some one hundred and seventy acres in area and are a part of a larger tract of about one thousand acres familiarly known as the Cherry Island Marsh. In 1810 the Legislature incorporated the owners of marsh lands lying in this larger tract and created them a body politic under the name of "the Cherry Island Marsh Company." The company thus formed had the power to erect and construct banks, canals, sluices, drains, etc., for the purpose of protecting the low marsh lands from overflow by the waters from the Delaware, Christiana and Brandywine rivers which bounded the entire tract on three of its sides. The expense of such construction and the continued maintenance thereof was to be borne by a system of taxes levied against the lands of the various owners. The principal damage by overflowing waters was done on the Christiana river side of the tract where a long and high

bank was erected and maintained for a great many years. A bank is now maintained by the company along that stream, and the owners of the land with which this foreclosure suit is concerned have duly contributed to the expense of the maintenance their share thereof as the same has from time to time been assessed against them. The fact of the maintenance of the Christiana bank at the expense of the owners as a means of protection from overflow by the tides is what lies at the bottom of the contention here made that the city of Wilmington had no power to levy the taxes now demanded to be paid out of the proceeds from the foreclosure sale. Banks on the other streams are not mentioned as factors in the situation.

It is contended that the land in question is exempt from all city taxes by reason of the act of the General Assembly above referred to. The material portions of that act are as follows:

"*Sec. 3.* That all marsh and meadow lands within the limits of the city of Wilmington that are protected from overflow by the tides by banks at the expense of the owners thereof, whereon no houses or buildings are erected, be and the same are hereby declared to be exempt from all taxes, assessments, burdens or impositions whatsoever for municipal purposes.

"*Sec. 4.* That any marsh or meadow land, as aforesaid which has been filled in, or which may hereafter be filled in or raised above high water, so as to become high and fast land, the expense of the same being borne by the owner, shall be exempt from all taxes, assessments, burdens or impositions whatsoever for municipal purposes for a period of ten years from the time said lands become high and fast lands."

The purpose of the act was as stated by Judge Heisel in *Electric Hose & Rubber Co. v. Wilmington*, 5 *Boyce*, 444, 94 *A.* 741, "to encourage the reclamation and subsequent improvement of the marsh and meadow land within the city limits." This purpose is doubtless what influenced the Legislature to grant the exemption from taxation which the act creates.

The judgment creditor contends that the land here in queston is exempt from taxation by the city of Wilmington because it falls within the descriptive language of *Section* 3 of the act, in that it is marsh or meadow land protected from overflow by the tides by banks at the expense of the owner thereof, no houses or buildings being erected thereon. It is admitted that there are no

houses or buildings erected on the land and no contention is made concerning the fact of the maintenance of banks by the owners. The only particular in which the city takes issue with the contention of the judgment creditor is in the highly important one, viz., that the land is in fact protected from tidal overflow by banks.

The facts dealing with this aspect of the question are as follows. The land is referred to in the testimony as containing an eastern and western half. Prior to 1913 the level of the entire tract was so low as to be subject in the absence of protecting banks to overflow by the tides. In that year the so-called western half was filled in. In 1920 that half was to some extent tilled. I think that from 1920, the first year that municipal taxes were laid, the so-called western half according to the testimony was filled so high as not to be subject to overflow by the tides. From then until 1924, however, the eastern half was, but for the protecting bank, subject to such overflow from the Christiana river, the level of that half being some feet below mean high water. In 1924, filling in of the eastern half was accomplished. This filling in was done by contractors with the United States Government whose contract called for the dredging of the bed of the Christiana. The method of dredging used by the contractors was to suck the earth from the bottom of the stream and dump it by pipes on the land in question. Retaining banks of earth were erected by the dredging company around the area to be filled, the eastern half of this tract, and sluiceways constructed to let the water back into the stream while the dirt was retained, settling on the old marsh. The fill thus made was twelve feet or more in depth and raised the level of the land here in controversy to some four or five feet above high-water mark. The retaining wall of earth erected by the dredging company was inside of the old bank which the Cherry Island Marsh Company had erected and maintained for protection against the tides during the preceding years when the level of the land was at its natural low point. The company still does some work, undergoing of course some expense, on the old bank and the owners claim that the old bank is still necessary to be maintained in order to protect the land from overflow notwithstanding the present level is well above highwater mark. As a matter of fact, no tide has since the 1924 fill been high enough to overflow the

land. How then, the level being raised so high by the fill, can it be said that banks are necessary to be now maintained by the owners in order to protect the land from tidal overflow?

In answering this question the solicitors for the judgment creditor make no claim that if the face of the land abutting on the river could be kept firm the tides would overflow it. Indeed they seem to concede the contrary of this. They do say, however, that the abutting edges of the land along the river front are composed of such soft earth that the flow of the tides and the wash of the steamers that ply in and out of the river to the port of Wilmington have an erosive effect thereon which is constantly drawing the abutting edges of the land into the stream, and that as this process goes on it is inevitably only a question of time before the entire fill will be drawn back into the river and the land thus reduced to its former level when it will be subject to overflow as before. Thus it is argued, the banks are necessary to protect the land from tidal inundations. When in the future such conditions will be brought about, no witness has ventured to hazard a guess.

Now such being the nature of the physical facts, can this land be said to be within the tax exemption scope of *Section* 3 of the act? In passing on this question it is important to bear in mind a principle which according to all the authorities is generally applicable to tax exemption statutes. That principle is that a special exemption from taxation is to be construed strictly against the property owner and in favor of the public. 2 *Cooley on Taxation*, (*4th Ed.*) § 672. "In other words," says the same author in the section referred to, "since taxation is the rule, and exemption the exception, the intention to make an exemption ought to be expressed in clear and unambiguous terms; it cannot be taken to have been intended when the language of the statute on which it depends is doubtful or uncertain; and the burden of establishing it is upon him who claims it." *State v. Bank of Smyrna*, in the Court of Errors and Appeals of this State, reported in 2 *Houst.* 99, 73 *Am. Dec.* 699, though not so explicit in its language as is the text of the noted author just quoted, supports his conclusion and is cited by him in conjunction with an abundance of other cases as authority for his text. The Supreme Court of the United States in

*Ford v. Delta & Pine Land Co.*, 164 *U. S.* 662, 17 *S. Ct.* 230, 41 *L. Ed.* 590, in announcing the same principle used this language:

"It is abundantly established by the decisions of this as of other courts that exemptions from taxation are to be strictly construed, and that no claim of exemption can be sustained unless within the express letter or the necessary scope of the exempting clause."

The principle by which a rule of strict construction is applied against a claim of tax exemption extends not only to the power to grant exemptions but as well also to a variety of other aspects of the subject such as to the scope of the exemption. *Cooley on Taxation*, (*4th Ed.*) § 672, *p.* 1411, and cases cited. To the general principle which thus imposes a rule of strict construction on all tax exemption claims, there are certain exceptions; but the instant case presents no feature falling within any of them.

In passing on the claim of exemption in this case I therefore apply the general rule and presume nothing in favor of the claim. It must fall clearly within the language of the statute or fail of acceptance. It seems to me that a common sense reading of *Section* 3 suggests that the sort of overflow contemplated by the Legislature is that which, but for privately maintained banks, would be presently occasioned by the ordinary rise of the tides. If all the banks now along the Christiana at the situs in question were instantly removed no tides, according to the evidence, would reach within four or five feet of the present level of the land. Any inundation of this land by tides, if it ever occurs, will be due not to lowness of the present surface, but because a process of erosion occasioned by tidal currents and the washing of passing steamers has, as it is put by the City Solicitor, caused the land itself to slide down into the river, rather than by an overflow of the river's banks. Of course it is manifest that, if the entire filled area comprising many acres is sucked out into the stream, the level of the tract will then be so low that ordinary tides would at their height overflow the banks and spread over the land. But that is not the case to-day. It has not been the case since 1913 on the western half, nor since 1924 on the eastern half. If *Section* 3 was intended to cover the case of an erosive eating away of the abutting edge of lands on the water front and the subsequent and consequential inundation of land by the tides at some indefinite time in the fu-

ture, such meaning must be gathered from a liberality of interpretation which the general rule applicable to the subject does not in my opinion allow.

The solicitors argue that the act in question must be construed in its entirety and that the court should examine all its parts for the elucidation of the meaning of any particular part. This argument is in accordance with accepted principles of statutory construction. The use which the solicitors for the judgment creditor make of the argument in this connection is that taking *Section* 4 in conjunction with *Section* 3 it must appear clear that the land, before it can be deprived of the benefit of the exemption given by *Section* 3, if it is filled land, must be not only high but fast, that the evidence shows that this filled land is not "fast" though high, and therefore, banks being necessary to keep the land from floating off, so to speak, with the currents and washes, the land may properly be said to require banks to protect it from tidal overflow. Definitions of "fast" are quoted from lexicographers of accepted authority to show that this land cannot be designated as fast land, for the reason that it has an insecure and mushy under stratum. This argument does not appeal to me. With out discussing it further it is sufficient to say that the act itself in *Section* 4 where the term "fast" is used shows the sense in which the term is to be understood. The language is:

"Land * * * which has been filled in * * * or raised *above high water*, so as to become high and fast land."

Here it seems to me is a clear legislative definition of the words "high and fast land" as meaning land "above high water," a definition within which the land in controversy clearly falls. If the law making body shows clearly the sense in which it uses a word, it is hardly permissible to look elsewhere for other meanings which the word may convey.

While the principle of statutory construction which requires an act to be examined in its entirety for any elucidating context, affords no aid to the judgment creditor in the way contended for by his solicitors, that principle does, however, fortify the city's contention, for *Section* 4 by its reference to land filled above high water would seem to indicate that the reference to overflow by

tides in *Section* 3 is meant to be confined to such overflow as is occasioned by the mere rising of the tides to their high-water mark and does not embrace the idea of their eroding effects upon the abutting faces of the littoral whereby the land may in the course of time become subject by slow gradations of progress to tidal overflows.

My conclusion is that inasmuch as the land in question is now safely above highwater mark and not subject to overflow by the tides even without the protecting banks, it is not exempt from municipal taxation by reason of anything contained in *Section* 3 of the act.

But if *Section* 3 confers no exemption, it is argued that *Section* 4 does. In support of this argument it is contended that the land has been filled above high-water mark at the expense of the owner and such being the case a ten-year exemption is allowed to it by *Section* 4. A prerequisite for exemption under *Section* 4 is that the expense of the filling shall be borne by the owner. Does the evidence show that this expense was borne by the owner? I think not. The only testimony produced on this point is to the effect that the owner in 1924 paid a fee to a lawyer to take up with the American Dredging Company and the United States Government the proposition that the dredgings from the Christiana river be deposited on this land, and to draw a contract under which the dredging company was to conduct its filling operations. The dredging company needed a place where it could dispose of the material taken from the river and was willing to dump it on this land, the most convenient place for it. The owner was entirely willing to permit the company to dump on the land for in that way it secured a fill of about twelve feet of earth. The only expense the owner was put to was that of a fee to its attorney for his services in inducing the dredger to fill the land and in drawing an agreement to protect the owner in the manner in which the work was done. The owner was to pay nothing and did pay nothing for the expense of the work of filling. The fill, so far as the owner was concerned, was a gift. *Section* 4 exempts from taxation only when the expense of the filing is borne by the owner. How the payment of a lawyer's fee for services in inducing and binding by contract another person to

bear the expense of filling land can be said to be a bearing of the expense of the filling by the lawyer's client, I am unable to see.

I conclude therefore that the land in question is not exempt from municipal taxation by reason of anything contained in *Section* 4 of the act.

There remain two other questions which need a word before this case is finally disposed of. It appears that the city is claiming taxes for seven years, 1920 to 1926, inclusive. So far as appears, the assessment is a lump assessment for each year—that is to say each yearly assessment embraces without distinguishing designations both the western and eastern half of the land in question. Now the evidence shows that down to 1924, the eastern half of the land was protected from overflow by the tides by banks at the expense of the owner. It was not so since 1913 for the western half. Down to the year 1924 therefore the eastern half was, under *Section* 3 of the act, exempt, and the western half was not. We have then a case where for the years 1920, 1921, 1922 and 1923 certainly, and possibly for the year 1924 (I am not clear whether the filing in that year had been completed before the assessment was made) lands subject to tax were blended in the assessment so as not to be distinguishable, with lands not subject to tax. That being the case, the entire assessment for each year to which the fact of blending is applicable is void and a tax based on such assessment is not collectible. *California v. Pacific R. R. Co.*, 127 *U. S.* 1, 8 *S. Ct.* 1073, 32 *L. Ed.* 150; *San Pedro, etc., Co. v. Los Angeles*, 180 *Cal.* 18, 179 *P.* 393; *Hart v. Smith*, 159 *Ind.* 182, 64 *N. E.* 661, 58 *L. R. A.* 949, 95 *Am. St. Rep.* 280; *Chicago, etc., Co. v. Kootenai County*, 33 *Idaho*, 234, 192 *P.* 562; 3 *Cooley on Taxation*, (*4th Ed.*) § 1075. Before entering a decree I should like to hear from the solicitors upon the question of whether the tax for 1924 is under the evidence to be classed in this respect with the taxes claimed for the four years preceding it. The claims for taxes for 1925 and 1926 are, if properly assessed, not defeated by the exemption claimed.

I just said—"if properly assessed"—because the point is raised that taxes for these two years should be disallowed for the reason that the city has failed to show that taxes for those years

were in fact assessed and levied. It is true that the city has failed to show this. What it did was simply to file bills for taxes in the office of the register of this court and thereby claim payment from the fund, offering no proof as to the assessment and levy. This procedure was in accordance with what I understand to be the practice of both the city and county tax officials when the prior claim for taxes is demanded out of proceeds from execution sales of real estate in the Superior Court where, of course, most judicial sales are made. In the case before me, the city and the judgment creditor are rival claimants of a fund. Their status is in essence that of interpleading parties in the main cause of the foreclosure suit. At no stage of the present proceedings prior to the filing of briefs has the judgment creditor raised the contention either by pleadings or oral suggestion, that the regularity of the assessment and levy was questioned. If something is desired to be made of the point that the assessment and levy were never made, or that some vitiating irregularity is attached to them, I think the city is entitled to seasonable notice and to be heard upon the point, and if necessary to produce evidence pertinent thereto. Before entering a decree, the city may if it sees fit move for an opening of the case in order to meet the objection raised on the brief.

Having disposed of the substantial questions of law thus far involved in the case, the case will stand over for later and ultimate disposition.

\* \* \*

NOTE. By stipulation of solicitors for the petitioner and the city of Wilmington, a decree was later entered in this cause requiring the payment out of the fund on deposit in court of municipal taxes assessed for the years 1925 and 1926 and the balance of said fund to the petitioner.