CHARLES M. BANKS, Collector of Taxes for the Northern District of the City of Wilmington, *v.* WILMINGTON TERMINAL COMPANY, a corporation of the State of Delaware.

490

494

(*December* 17, 1941.)

RODNEY and SPEAKMAN, J. J., sitting.

*Reuben Satterthwaite, Jr.,* and *Leonard G. Hagner* for plaintiff.

*E. Ennalls Berl* and *Herbert L. Cohen* for defendant.

Superior Court for New Castle County, No. 168, May Term, 1936.

RODNEY, J., delivering the opinion of the Court:

Just when the river banks were first erected does not affirmatively appear, but it seems clear that they were erected long prior to 1898, the date of the statute here involved, and that they were erected at the expense of the owners. It is likewise admitted that no houses or buildings are erected on said lands, so that these pertinent provisions of the statute of 1898 seem to have been met.

Between the years 1906 and 1910, two fills were made on the property fronting along the Delaware River, covering a tract approximately bounded on the North by the Shellpot Sluice, and on the South by Fourth Street, and this tract covers all of the lots here involved. The aggregate extent of these two fills was expected to amount to about 4,000,000 cubic yards. These fills were made from the Delaware River on the East, by means of dredged material passing through pipe lines over or through the bank, and as a consequence the fill was greater on the east or

river side and then tapered off toward the western part of the tract.

The entire tract bounded by Fourth Street and the Shellpot Sluice remained in its then condition until 1931. On February 2, 1931, the Atlantic Gulf and Pacific Company having a contract to deepen the channel of the Christiana River, entered into a contract with the Wilmington Terminal Company, whereby the former contracted to pay to the latter the sum of $15,800 for the privilege of pumping the dredged material upon the land of the defendant. Eight days later, on February 10, 1931, the Wilmington Terminal Company contracted to pay the Atlantic Gulf and Pacific Company the sum of $8,500 for the erection of banks to retain the fill contemplated by the first contract. This fill of 1931 was made as contemplated and covered a portion of the land involved in this suit, viz., all of the lots Nos. N-11327 and N-11354, and portions of the lots Nos. N-11329 and N-11358. Testimony was admitted showing that because of the fills of mud having been made upon what had theretofore been marshland, there was consequently a difference between the character of the soil at the upper surface and the soil at a few feet below the surface, and the latter soil was much softer and more unstable.

Under these circumstances the defendant contends:

(1)   That all of the lands here involved are marsh or meadow land protected from overflow by the tides by banks, at the expense of the owners, and so exempt from taxation under the provisions of Section 3, as above set out.

(2)   That because of the unstable nature of the sub-surface soil, no part of the land has become "high and fast land" within the meaning of Section 4.

(3)   That if all of the land is not exempt from taxa-

tion under Section 3, and because of the character of the sub-surface soil, then the only "high and fast land" is that portion of the land which was subject to the fill of 1931, and as to this is made the contention that said land, by Section 4, is exempt from taxation for ten years from 1931. This contention has covered all of lots N-11327 and N-11354, and portions of lots N-11329 and N-11358.

(4) That if only a portion of lots Nos. N-11329 and N-11358 is exempt from taxation under Section 4 of the Act, by reason of the 1931 fill, then all portions of said lots are exempt from taxation insofar as the present suit is concerned, because there has been a single assessment covering both land which is not exempt together with land which is exempt.

The plaintiff contends:

(1) That no part of the land in question is exempt from taxation under Section 3 of the Act, because no part of the land is marsh or meadow within the meaning of the statute.

(2) That the land is not protected from overflow by banks, by reason of the fact that the successive fills have raised the lands within the banks to substantially the elevation of the banks themselves, and that the banks do not protect the land from overflow of tides, but at the most have an effect upon erosion.

(3) That the term "high and fast land" is defined by the statute itself, and is not determined by the character of the sub-surface soil.

(4) That no part of the land is exempt from taxation under Section 4 of the Act, because no part of the land has been filled in or raised above high water at the expense of the owner, as required by the statute.

■ Some slight preliminary mention must be made of the general principle governing claimed statutory exemption from taxation. The general principle is that exemptions from taxation are to be strictly construed, and that no claim of exemption can be sustained unless it be within the express letter or the necessary scope of the exempting clause. *Delaware Registration Trust Co. v. Delaware F. & S. Co.,* 15 *Del. Ch.* 381-386, 138 *A.* 620; *Mayor and Council of Wilmington v. Riverview Cemetery Co.,* 8 *W. W. Harr.* (38 *Del.*) 182, 190 *A.* 111.

The particular statute here involved has been considered several times. *Electric Hose & Rubber Co. v. Mayor and Council of Wilmington,* 5 *Boyce* (28 *Del.*) 444, 94 *A.* 741; *Delaware Registration Trust Co. v. Delaware F. & S. Co., supra; Frazier and Wilson v. Mayor and Council of Wilmington,* [1] *(unreported) Court of Chancery, New Castle County,* 1930; *Stirlith Bros. Co. v. Mayor and Council of Wilmington,* 21 *Del. Ch.* 356, 189 *A.* 880.

■ The general purpose of the exempting act as stated in the Electric Hose & Rubber Co. case, supra, and the Delaware Registration Trust Co. case, supra [15 Del. Ch. 381, 138 A. 621], was "to encourage the reclamation and subsequent improvement of the marsh and meadow land within the city limits." It is unnecessary for us to consider whether any element of the improvement of public health by the elimination of open marsh following the erection of the banks, furnished any additional reason for the passage of the Act. The reclamation and improvement might be expected to result from the action contemplated in Section 4, viz., the filling in of the marsh. The elimination of open marsh subject to overflow by the tide, and the consequent exemption from taxation is the subject of Section 3, which does not directly concern reclamation.

[1] No opinion for publication.

■ It is, however, sufficient for us to say that any marsh or meadow land which was taxable before the passage of the Act became exempt from taxation thereafter, upon the erection, at the expense of the owners, of banks which protected the lands from overflow by the tides. ·

We thus approach a consideration of the lands at the time the first fills were made thereon, between the years 1906 and 1910, which we shall call the fill of 1910. It is, we think, conceded that all of the lands here involved were subject to the same treatment by this fill of 1910, subject to the observation that, due to the method of making the fill, the land nearest the river bank, being nearest the end of a delivery pipe, became higher than the more remote portions.

For this preliminary discussion we will consider that portion of lot No. N-11329 which was not included in the subsequent fill of 1931, but remains today in substantially the same condition as it was after the fill of 1910.

■ While it is true that Section 3 of the statute, for the property coming within its terms, covers an exemption without limitation of time, and Section 4 covers an exemption limited to the period of ten years, yet in view of the language of the statute we think the two sections, in some degree, must be considered together.

### N-11329

■ Now it seems to be conceded that lot N-11329 prior to 1910 was exempt from taxation under Section 3. It was marsh land protected from overflow by banks at the expense of the owners, and there were no buildings thereon. Being exempt prior to the fill of 1910, under Section 3, then we think, for the purposes of this case, the land remains exempt until the physical aspects of the land are so

changed as to make applicable the provisions of Section 4. In determining whether this has been brought about certain questions are presented and require solution.

(1) Is the land still marsh land, notwithstanding the fill of 1910, and as such entitled to continued exemption from taxes under Section 3 of the Act?

(2) Is the land protected by banks?

(3) Has it been filled in or raised above high water?

(4) Has it become high and fast land?

(1) Marsh land has been defined to be "soft, wet land commonly covered partly or wholly by water." Webster's International Dictionary. It seems to be generally conceded that the entire Cherry Island marsh tract was, in fact, prior to the erection of the banks, marsh land within the quoted definition. The present Court, at the instance of both parties to this litigation, made a personal inspection of the lands in controversy, and are clearly of the opinion that the land is not now marsh. The minutes of Cherry Island Marsh Company have been introduced in evidence, and at a meeting on March 7, 1910 (after the so-called fill of 1910) the minutes show that the chairman advised "that the land owners should mark off their property lines on the new fill which was in condition capable of being utilized at this time for farming or other purposes." A portion of the property contains a grove of locust trees some three or four inches in diameter.

We are clearly of the opinion that the land is not now marsh land. It is unnecessary, in view of our subsequent conclusion, to determine whether embanked marsh land originally exempt under Section 3 could be so filled in as to become meadow land and still be exempt under Section 3, for marsh land, we think, may be different from meadow

land. This question will be sufficiently dealt with in our subsequent discussion.

The city contends that the land is not protected from overflow by the tides, because the lands within the banks are of substantially the same elevation as the banks themselves, and that the banks do not protect from overflow, but merely from erosion. We cannot agree with this contention in its fullest extent, unless the elevation of most of the land is of substantially the elevation of the bank. If only a limited portion immediately within the bank and adjoining it is of the elevation of the bank itself, then the effect of such work might be the mere widening of the bank and not the filling of the land.

We have carefully examined the official map made in 1927 or 1928, and which was conceded to be correct and adopted by both parties, and admitted into evidence. Lot No. N-11329, as shown on that map, originally consisted of all or portions of five smaller lots which we, for convenience, call N-11329 A to E, inclusive, beginning at the North. Confining, for the present, our consideration to that part of Lot N-11329 subject to the fill of 1910, but not subject to the subsequent fill of 1931 (which would include our arbitrary designations of N-11329 A, N-11329 B, N-11329 C, and a portion of N-11329 D) we here give the elevations of the bank and of the land immediately within the bank. Using the datum tidal plane of the City of Wilmington, at the Marine Terminal at mean low tide as zero (0), and starting from the north end of lot N-11329 A, the relative elevations are:

| Elevation of bank | Elevation immediately within the bank |
|---|---|
| 11.16 | 5.3 |
| 9.94 | 9.9 |

| | |
|---|---|
| 11.19 | 10.2 |
| | 12.4 |
| 13.15 | 11.8 |
| 12.53 | 10.7 |
| 13.06 | 10.3 |
| 12.30 | 10.9 |

We may eliminate from our discussions the most northern elevation of the premises (adjoining Shellpot Sluice) of 5.3 for the reason that it is in evidence that about the year 1918 the defendant allowed this land to be excavated and reduced from its then level by a Railroad Company seeking to improve its land farther to the west.

Starting then with the next given elevation some 300' to the South, we find the elevation of the bank is 9.94 and that of the land immediately within the bank is 9.9, or a difference of .04 which being less than one-half inch is, of course, negligible.

The elevation of the bank erected by the defendant being 9.94 we think that elevation fixes the point beyond which the defendant cannot contend the land need be filled so as to be deemed filled "above high water" within the meaning of Section 4. The defendant, we think, cannot contend that a greater elevation than 9.94 is necessary for the fill in order to bring the land "above high water" within the meaning of Section 4, when it has only provided a bank of 9.94 to prevent overflow by tides and thus acquire the initial exemption under Section 3.

If substantially all of the land within lot N-11329 had an elevation of 9.94, we think, insofar as this phase of the case is concerned, that such lot would be deemed to be filled "above high water," within the meaning of the Act. In determining whether the lot did have this uniform elevation we have utilized the information from the contour lines

superimposed by the defendant upon the official plot. From these lines and the evidence it is apparent that the land is higher near the outlet of the pipes through which the dredged material was pumped. Aside from this the land at the South end is generally higher than at the North end. At the North end of Lot N-11329 lies the lot we have arbitrarily called lot N-11329 A. This was portion of a lot of 5.6 A and the assessed portion begins at a contour elevation of 7 feet. This Lot N-11329 A is largely composed of land having contour elevation of from 7 to 8 feet, and except very close to the river bank seems not to exceed those figures. It is, concededly, as low or lower than any other land in the entire tract.

Without, at this point, going deeply into the question of tidal levels it is sufficient to say that there was in evidence the record of the tides, with some omissions, from 1923 to 1936. From 1931 to 1934 the average high tide was 6.88 above the city datum plane, and during the period covered by the evidence there is a record of some 5700 tides above six feet, some 2800 being above seven feet. From this we cannot say that land having a contour elevation of 7 feet, and being immediately behind a bank of 9.94, is necessarily raised above high water. A more detailed consideration of the tides is given under our treatment of Lot N-11358.

■ We are in entire accord with the holding of *Stirlith Bros. v. Mayor and Council of Wilmington, supra* [189 A. 882], where it is said:

"The statute does not contemplate that land lying below tide level but which is in the midst of high and fast land, and therefore not subject to overflow, shall be exempt."

The low land here involved, however, is not in the

midst of high land but off by itself, almost immediately adjoining the bank, and no reason is suggested why it was joined with the higher land in a single assessment.

The law seems firmly settled that if exempt property be included in a single assessment with property not exempt, such inclusion makes the entire assessment invalid. *Delaware Registration Trust Co. v. Delaware Forge & Steel Co.*, 15 *Del. Ch.* 381, 138 *A.* 620.

For this reason we hold the assessment on Lot N-11329 invalid.

### Lot N-11327

This is a small lot fronting on the Delaware River and extending backward to the Hay or Marsh Road, and contains some 4.04 acres. It adjoins N-11329 E immediately to the South or Southwest, and seems to have been of the same general character as the adjoining lot after the fill of 1910, and prior to the fill of 1931. In 1928 the Northwest corner of Lot N-11327 had an elevation on Marsh Road of 10.51, and at the Northeast corner of 10.61. Along the front the bank and land within the bank had an elevation of upwards of 13 feet. No contour lines were run in 1928, but it is in evidence that the land gently sloped from the front to back (i. e. from 13.12 to 10.61). It seems to us that the same reasoning that we have applied to N-11329 is applicable to N-11327, and that after the fill of 1910 the lot was "filled * * * above high water" within the meaning of the Act of Assembly. From an inspection of the land and maps we should have arrived at this conclusion as to the adjoining portion of N-11329 D and N-11329 E, had they not been joined in a single assessment with N-11329 A, as to which we could not say that it had been raised above high water.

In view of our conclusion we enter into no elaborate discussion as to the effect on this lot of the fill of 1931. We think it clear that if the land was raised above high water by the fill of 1910, then a desire to have the land still higher and resulting in the fill of 1931, would create no new and additional exemption by reason of the later fill.

In our discussion of Lot N-11329 it was unnecessary to consider the contention of the defendant that because of the unstable nature of the sub-surface soil no part of the land has become high and fast land within the meaning of Section 4.

Elaborate test borings were made to determine the character of the sub-surface soil, and expert testimony was produced to show the character of improvements that such soil would support. It was urged by the defendant that the fills created a sort of crust above an unstable or soft sub-stratum which was insufficient to support improvements, so that the lands had not become "high and fast land" within the meaning of Section 4 of the statute, and definitions of "fast land" were pressed upon the Court. This precise question was passed upon by Chancellor Wolcott as to lands similar to the present and forming part of the same original tract and construed under the same statute. He said in *Delaware Registration Trust Co. v. Delaware F. & S. Co., supra*:

"Definitions of 'fast' are quoted from lexicographers of accepted authority to show that this land cannot be designated as fast land, for the reason that it has an insecure and mushy under stratum. This argument does not appeal to me. Without discussing it further it is sufficient to say that the act itself in section 4 where the term 'fast' is used shows the sense in which the term was used. The language is: 'Land * * * which has been filled in * * * or raised

above high water, so as to become high and fast land.' Here it seems to me is a clear legislative definition of the words 'high and fast land' as meaning land 'above high water,' a definition within which the land in controversy clearly falls. If the law making body shows clearly the sense in which it uses a word, it is hardly permissible to look elsewhere for other meanings which the word may convey."

We agree with and adopt this conclusion, and we think Lot N-11327 is liable to present assessment and is taxable.

### N-11354

This lot, we think, differs from either of the lots hereinbefore discussed, and will require somewhat different consideration. While this lot was subject to the 1910 fill, we have no measurements as to the elevation of the land, with the exception of one corner elevation given at 8.5. This lot lies some 843 feet westward and back from the Delaware River bank, and is bounded on the East by the Hay or Marsh Road. Substantially all of the evidence we have relative to the land prior to and exclusive of the 1931 fill is that the land westward from the Hay or Marsh Road had an elevation of "at least seven feet." Just as in the consideration of Lot N-11329 we could not say that an elevation of seven feet was a compliance with Section 4 of the statute as "raised above highwater," so we think the same reasoning applies to Lot N-11354. The present lot, however, differs from lot N-11329 in that all of the present lot was subject to the fill of 1931, and to the consideration of that fill we must address ourselves. As shown by the statement of facts, on February 2, 1931, the Atlantic Gulf and Pacific Company having a contract to deepen the channel of the Christiana River, entered into a contract with the Wilmington Terminal Company whereby the former contracted to pay to the latter the sum of $15,800 for the privilege of

pumping the dredged material upon the land of the Terminal Company. On February 10, 1931, the Wilmington Terminal Company agreed to pay the Atlantic Gulf and Pacific Company the sum of $8,500 for the erection of banks to retain the fill contemplated by the first contract. This fill was duly made, and covered all of Lot N-11354.

The city contends that the two contracts must be considered together and that the net result of the two contracts is that the Terminal Company had a profit from the filling operation of $7,300, and thus there is no exemption under Section 4 of the statute which grants the exemption following a fill "the expense of the same being borne by the owner."

We think we are correct in assuming that the present lot has been, by the fill of 1931, "filled in or raised above high water, so as to become high and fast land." We must then see what the statute means where it speaks of the fill at the expense of the owners. The purpose of the exemption in Section 4, qualified and limited to ten years after the property has been raised above high water so as to become high and fast land, is, as we have seen, "to encourage the reclamation and subsequent improvement" of the marsh or meadow land. The owner presumably profits from the improvement of the land and the city also profits from the general improvement of the land and the prospect of its becoming available for taxation. We cannot see that it is material to the city to inquire who actually paid the cost of filling the land, provided that it is so filled and no public expenditure is involved. We think it is too constricted a view to hold that in such case an owner cannot either gratuitously or for a consideration moving from him accept the offer of available fill from a person who has such material on hand and desires to dispose of it. We think the statute means that the fill must be made by or on behalf of the

owners and at the owner's expense as contrasted with the expense of the public. The city can have no interest in the purely private arrangment between the parties making the fill and the actual financial settlement between them.

The statute in speaking of the fill which would create a limited exemption says "the expense of the same being borne by the owner." Now "borne" is the past participle of the verb "bear", which has many meanings. Among these meanings, as shown by Webster's International Dictionary, is "to be answerable for as * * * expenses." In such sense we think the word "borne" was used by the Legislature, viz., that the owners should be answerable for the expense of the fill and that no part of the expense should fall upon the public.

See *Teeter v. Mid-West Enterprise Co.*, 174 *Okl.* 644, 52 *P.* 2d 810, 812.

We are not unmindful of the fact that in *Delaware Registration Trust Co. v. Delaware F. & S. Co.*, 15 *Del. Ch.* 381, 138 *A.* 620, a strongly analogous matter was determined. There, under this identical act, it was determined that a fill which was a gift, so far as the owner was concerned, was not made at the expense of the owner and thus constituted no basis for the exemption set out in Section 4 of the statute. We regret that we cannot adopt that conclusion, and we can draw no valid distinction between the two cases.

We hold that lot N-11354 is exempt from assessment and taxation for 10 years subsequent to 1931.

### N-11358

The consideration of this lot includes a portion of the consideration given to lot N-11329 and also lot N-11354. The lot is composed of two parcels of 6.8 and 6.2

acres respectively. It lies directly back of N-11327 and N-11329 E, and is bounded on the East by Marsh Road, and is located from 600 to 700 feet West of the Delaware River. The 6.2 acre parcel (which we call N-11358 A) is divided by a diagonal line drawn from the East corner to the West corner, and one-half of this parcel and all of 6.8 acre parcel (N-11358 B) are included in the 1931 fill. As to all of the portion within the 1931 fill, we think it is subject to the same consideration accorded lot N-11354, viz., that it is exempt from assessment and taxation for ten years from 1931. As to that portion or parcel of N-11358 A which is North or Northeast of the diagonal line bisecting the parcel and showing the limit of the 1931 fill, we have little or no information of the elevations. This part of the lot has been subject solely to the fill of 1910. As to this lot there is not a single elevation upon the plot as it was originally drawn prior to the 1931 fill, or contour since that date. From an inspection of the land and of the surrounding lots as they appear on the plot, it would seem that the lot might have an elevation, on at least a part of it, of eight feet, and that it might be subject to overflow from Shellpot Creek and sluice. We cannot say, as a matter of law, that this portion of the lot has been raised above high water. The term "high water" is a term easier to define than to accurately apply to a given state of facts. It means the line marked by the periodical flow of the tide and uninfluenced by wind, storms, freshets or floods.

We have indicated that we think the defendant cannot insist that it be proved that the lands were raised higher than 9.94 in order to be above high water and thus limit the exemption, because that is the elevation at one point of the bank erected by the defendant to withstand the overflow of tides, and the two terms, we think, in a sense, are equivalent one to the other.

Certain tidal elevations were introduced into evidence. From 1931 to 1934 the average high tide was 6.88 feet. Covering a much longer period there were 2988 tides between six and seven feet; 2502 tides between seven and eight feet; 446 tides between eight and nine feet, and twenty tides between nine and ten feet. We are entirely without information as to whether these tides, or any of them, were influenced by wind, storms, freshets or floods.

It is most difficult to precisely fix a mathematical figure as exactly representing that point contemplated by the statute as "above high water." It is quite obvious to us that the term does not mean a point beyond which no unforseeable or unpredictable tide could go. It is, we think, equally clear that the statute does not mean the average high tide over a four year period, and which has been fixed at 6.88.

"Ordinary" high tide or high water has been the subject of many decisions, among them being the recent case of *City of Los Angeles v. Borax Consolidated Limited*, (9 *Cir.*) 74 *F. 2d* 901, and the same case of certiorari in 296 *U. S.* 10, 56 *S. Ct.* 23, 80 *L. Ed.* 9. There the court considered those tides of which the law takes notice as

(1) The high spring tides which are the fluxes of the sea at those tides which happen at the two equinoctials.

(2) The spring tides which happen twice every month, at the full and change of the moon.

(3) The neap or ordinary tides which happen between the full and change of the moon twice in the 24 hours.

In the cited cases the court held the "ordinary high tide" to be the "average" of all high tides, but for purposes of fixing a boundary line of valuable tide lands, and

based upon scientific and astronomical reasons the Court said this average should be computed upon records of at least 18.6 years. In the present case we are not fixing a boundary line, but attempting to determine the statutory meaning of "high water," having in mind the purposes of the Act.

The purpose of the Act is clearly the reasonable protection of the land against the inundation of the tides, and a reasonable interpretation would seem to be that the term "above high water" means above a tide which might reasonably be expected to recur with some degree of frequency.

"Average" high tide or high water, or "ordinary" high tide or high water are neither of them, in our opinion, the "high water" which is contemplated by the statute. In arriving at an average high tide, or ordinary tide (whether it be for the space of four years or a longer period), it is more than possible that there would be just as many tides below the average as above that figure, and that is substantially the fact in the present case. It would be difficult to sustain a claimed exemption (under Section 3) on account of the erection of banks which were designed to protect the lands from overflow by tide, when such banks would afford no protection whatever in the case of 50 per centum of the tides. A bank protecting only half of the time is of little value.

The determination of the meaning of the term "above highwater," as used in the statute, is a mixed question of law and fact—of law as determining the meaning of the statutory term itself, and of fact as correlating that meaning with the physical facts of the tides themselves.

During the period for which there is evidence of tidal changes (with approximately 25 per centum of

the time omitted) there have been 446 tides between 8.01 and 9 feet, so that it is quite probable that there might have been 560 tides between those figures during the full period of time. Recognizing that the larger portion of these 560 tides were nearer 8.01 than 9 feet, we think a purely arbitrary figure of 8.5 is a figure which could represent the lowest elevation of land which would be above such "high water" as might reasonably be expected to recur with some degree of frequency. We recognize that the figure is purely arbitrary, as any figure must be in view of the facts and of the evidence, but it does bear some relation to the low point of the bank of 9.94 which was built to protect against the overflow of tides, and which might be presumed to have some margin of safety.

From the information before us we cannot say that the northern half of lot N-11358 A has been filled in above high water.

Lot No. N-11358 is not subject to the objection of joining in a single assessment assessable land with land which is exempt, for the reason that we have held that no part is assessable for the ten year period following the fill of 1931.

Summarizing, therefore, we would say:

(1) That we find lot N-11329 is not legally assessed because it joins the lot arbitrarily called N-11329 A (which we think is exempt) with lots called N-11329 B to N-11329 E, which we think would have been legally assessable if assessed separate and apart from the exempt lot.

(2) That we find lot N-11327 legally assessable.

(3) That we find lot N-11354 legally assessable, but exempt from assessment for ten years from 1931, or until the assessment of 1942.

(4)    That we find no part of lot N-11358 assessable before 1942.   As to this lot we think that the parcel arbitrarily called N-11358 B, and a portion of N-11358 A South of the diagonal line bisecting the parcel, would be assessable subsequent to 1941, provided it was not included with land otherwise exempt.

By the stipulation between the parties the formal proof of the due assessment and levy of the taxes involved was postponed until the liability of the lands to assessment had been determined.   Opportunity will be given for the formal proof in conformity with this opinion.