BORAX CONSOLIDATED, LTD. ET AL. *v.* LOS ANGELES.

No. 34. Argued October 23, 1935.—Decided November 11, 1935.

12

*Mr. A. W. Ashburn,* with whom *Mr. Gurney E. Newlin* was on the brief, for petitioners.

*Mr. Loren A. Butts,* with whom *Mr. Ray L. Chesebro* was on the brief, for respondent.

By leave of Court, *Messrs. Oscar Lawler* and *Eugene M. Prince* filed a brief as *amici curiae,* in support of certain contentions of respondent.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The City of Los Angeles brought this suit to quiet title to land claimed to be tideland of Mormon Island situated in the inner bay of San Pedro now known as Los Angeles Harbor. The City asserted title under a legislative grant by the State. Stats. Cal. 1911, p. 1256; 1917, p. 159.[1]

---

[1] The Act of 1911 (Stats. 1911, c. 656, p. 1256) provided: "There is hereby granted to the city of Los Angeles, a municipal corporation of the State of California, and to its successors, all the right, title and interest of the State of California, held by said state by virtue of its sovereignty, in and to all tide lands and submerged lands, whether filled or unfilled, within the present boundaries of said city,

Petitioners claimed under a preëmption patent issued by the United States on December 30, 1881, to one William Banning. The District Court entered a decree, upon findings, dismissing the complaint upon the merits and adjudging that petitioner, Borax Consolidated, Limited, was the owner in fee simple and entitled to the possession of the property. 5 F. Supp. 281. The Circuit Court of Appeals reversed the decree. 74 F. (2d) 901. Because of the importance of the questions presented, and of an asserted conflict with decisions of this Court, we granted certiorari, June 3, 1935.

In May, 1880, one W. H. Norway, a Deputy Surveyor, acting under a contract with the Surveyor General of the United States for California, made a survey of Mormon Island. The surveyor's field notes and the corresponding plat of the island were approved by the Surveyor General and were returned to the Commissioner of the General Land Office. The latter, having found the survey to be correct, authorized the filing of the plat. The land which the patent to Banning purported to convey was described by reference to that plat as follows: " Lot numbered one, of section eight, in township five south, of range thirteen west of San Bernardino Meridian, in California, containing eighteen acres, and eighty-eight hundredths of an acre, according to the Official Plat of the Survey of the said Lands, returned to the General Land Office by the Surveyor General."

The District Court found that the boundaries of " lot one," as thus conveyed, were those shown by the plat

---

and situated below the line of mean high tide of the Pacific ocean, or of any harbor, estuary, bay or inlet within said boundaries, to be forever held by said city, and by its successors, in trust for the uses and purposes, and upon the express conditions following, to wit: " The conditions which followed are not material here.

The granting clause above quoted is the same in the Act of 1917 (Stats. 1917, p. 159),

14

and field notes of the survey; that all the lands described in the complaint were embraced within that lot; and that no portion of the lot was or had been tideland or situated below the line of mean high tide of the Pacific Ocean or of Los Angeles Harbor. The District Court held that the complaint was a collateral, and hence unwarranted, attack upon the survey, the plat and the patent; that the action of the General Land Office involved determinations of questions of fact which were within its jurisdiction and were specially committed to it by law for decision; and that its determinations, including that of the correctness of the survey, were final and were binding upon the State of California and the City of Los Angeles, as well as upon the United States.

The Circuit Court of Appeals disagreed with this view as to the conclusiveness of the survey and the patent. The court held that the Federal Government had neither the power nor the intention to convey tideland to Banning, and that his rights were limited to the upland. The court also regarded the lines shown on the plat as being meander lines and the boundary line of the land conveyed as the shore line of Mormon Island. The court declined to pass upon petitioners' claim of estoppel *in pais* and by judgment, upon the ground that the question was not presented to or considered by the trial court, and was also of the opinion that the various questions raised as to the failure of the City to allege and prove the boundary line of the island were important only from the standpoint of the new trial which the court directed. 74 F. (2d) p. 904. For the guidance of the trial court the Court of Appeals laid down the following rule: The " mean high tide line " was to be taken as the boundary between the land conveyed and the tideland belonging to the State of California, and in the interest of certainty the court directed that " an average for 18.6

years should be determined as near as possible by observation or calculation." *Id.*, pp. 906, 907.

Petitioners contest these rulings of the Court of Appeals. With respect to the ascertainment of the shore line, they insist that the court erred in taking the "mean high tide line" and in rejecting "neap tides" as the criterion for ordinary high water mark.

1. The controversy is limited by settled principles governing the title to tidelands. The soils under tidewaters within the original States were reserved to them respectively, and the States since admitted to the Union have the same sovereignty and jurisdiction in relation to such lands within their borders as the original States possessed. *Martin* v. *Waddell*, 16 Pet. 367, 410; *Pollard* v. *Hagan*, 3 How. 212, 229, 230; *Goodtitle* v. *Kibbe*, 9 How. 471, 478; *Weber* v. *Harbor Commissioners*, 18 Wall. 57, 65, 66; *Shively* v. *Bowlby*, 152 U. S. 1, 15, 26. This doctrine applies to tidelands in California. *Weber* v. *Harbor Commissioners, supra; Shively* v. *Bowlby, supra,* pp. 29, 30; *United States* v. *Mission Rock Co.*, 189 U. S. 391, 404, 405. Upon the acquisition of the territory from Mexico, the United States acquired the title to tidelands equally with the title to upland, but held the former only in trust for the future States that might be erected out of that territory. *Knight* v. *United States Land Assn.*, 142 U. S. 161, 183. There is the established qualification that this principle is not applicable to lands which had previously been granted by Mexico to other parties or subjected to trusts which required a different disposition,—a limitation resulting from the duty resting upon the United States under the treaty of Guadalupe Hidalgo (9 Stat. 922), and also under principles of international law, to protect all rights of property which had emanated from the Mexican Government prior to the treaty. *San Francisco* v. *Le Roy*, 138 U. S. 656, 671; *Knight* v. *United*

16

*States Land Assn., supra; Shively* v. *Bowlby, supra.* That limitation is not applicable here, as it is not contended that Mormon Island was included in any earlier grant. See *DeGuyer* v. *Banning,* 167 U. S. 723.

It follows that if the land in question was tideland, the title passed to California at the time of her admission to the Union in 1850. That the Federal Government had no power to convey tidelands, which had thus vested in a State, was early determined. *Pollard* v. *Hagan, supra; Goodtitle* v. *Kibbe, supra.* In those cases, involving tidelands in Alabama, the plaintiffs claimed title under an inchoate Spanish grant of 1809, an Act of Congress confirming that title, passed July 2, 1836, and a patent from the United States, dated March 15, 1837. The Court held that the lands, found to be tidelands, had passed to Alabama at the time of her admission to the Union in 1819, that the Spanish grant had been ineffective, and that the confirming Act of Congress and the patent conveyed no title. The Court said that "·The right of the United States to the public lands, and the power of Congress to make all needful rules for the sale and disposition thereof, conferred no power to grant to the plaintiffs the land in controversy." *Pollard* v. *Hagan, supra.* See also *Shively* v. *Bowlby, supra,* at pp. 27, 28; *Mobile Transportation Co.* v. *Mobile,* 187 U. S. 479, 490; *Donnelly* v. *United States,* 228 U. S. 243, 260–261.

2. As to the land in suit, petitioners contend that the General Land Office had authority to determine the location of the boundary between upland and tideland and did determine it through the survey in 1880 and the consequent patent to Banning, and that this determination is conclusive against collateral attack; in short, that the land in controversy has been determined by competent authority not to be tideland and that the question is not open to reëxamination. Petitioners thus invoke the rule

that " the power to make and correct surveys belongs to the political department of the government and that, whilst the lands are subject to the supervision of the General Land Office, the decisions of that bureau in all such cases, like that of other special tribunals upon matters within their exclusive jurisdiction, are unassailable by the courts, except by a direct proceeding." R. S., §§ 453, 2395–2398, 2478; 43 U. S. C. 2, 751–753, 1201. *Cragin* v. *Powell*, 128 U. S. 691, 698, 699; *Heath* v. *Wallace*, 138 U. S. 573, 585; *Knight* v. *United States Land Assn.*, *supra; Stoneroad* v. *Stoneroad*, 158 U. S. 240, 250, 252; *Russell* v. *Maxwell Land Grant Co.*, 158 U. S. 253, 256; *United States* v. *Coronado Beach Co.*, 255 U. S. 472, 487, 488.

But this rule proceeds upon the assumption that the matter determined is within the jurisdiction of the Land Department. *Cragin* v. *Powell, supra.* So far as pertinent here, the jurisdiction of the Land Department extended only to " the public lands of the United States." The patent to Banning was issued under the preëmption laws, which expressly related to lands " belonging to the United States." R. S. 2257, 2259. Obviously these laws had no application to lands which belonged to the States. Specifically, the term " public lands " did not include tidelands. *Mann* v. *Tacoma Land Co.*, 153 U. S. 273, 284. " The words ' public lands ' are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws." *Newhall* v. *Sanger*, 92 U. S. 761, 763; *Barker* v. *Harvey*, 181 U. S. 481, 490; *Union Pacific R. Co.* v. *Harris*, 215 U. S. 386, 388.

The question before us is not as to the general authority of the Land Department to make surveys, but as to its authority to make a survey, as a basis for a patent, which would preclude the State or its grantee from showing in an appropriate judicial proceeding that the survey was in-

18

accurate and hence that the patent embraced land which the United States had no power to convey. Petitioners' argument in substance is that while the United States was powerless as against the State to pass title to tidelands in the absence of a survey (*Pollard* v. *Hagan, supra*), the question whether or not the land was tideland would be foreclosed by a departmental survey, although erroneous. This contention encounters the principle that the question of jurisdiction, that is, of the competency of the Department to act upon the subject matter, is always one for judicial determination. "Of course," said the Court in *Smelting Co.* v. *Kemp,* 104 U. S. 636, 641, "when we speak of the conclusive presumptions attending a patent for lands, we assume that it was issued in a case where the department had jurisdiction to act and execute it; that is to say, in a case where the lands belonged to the United States, and provision had been made by law for their sale. If they never were public property, or had previously been disposed of, or if Congress had made no provision for their sale, or had reserved them, the department would have no jurisdiction to transfer them, and its attempted conveyance of them would be inoperative and void, no matter with what seeming regularity the forms of law may have been observed." The Court added that questions of that sort " may be considered by a court of law "; for in such cases " the objection to the patent reaches beyond the action of the special tribunal, and goes to the existence of a subject upon which it was competent to act." *Id.* See, also, *Polk* v. *Wendall;* 9 Cranch 87, 99; *Moore* v. *Robbins,* 96 U. S. 530, 533; *Wright* v. *Roseberry,* 121 U. S. 488, 519; *Doolan* v. *Carr,* 125 U. S. 618, 625; *Hardin* v. *Jordan,* 140 U. S. 371, 401; *Crowell* v. *Benson,* 285 U. S. 22, 58, 59. Here, the question goes to the existence of the subject upon which the Land Department was competent to act. Was it upland, which the United States could patent, or tideland, which

it could not? Such a controversy as to title is appropriately one for judicial decision upon evidence, and we find no ground for the conclusion that it has been committed to the determination of administrative officers.

Petitioners urge a distinction in that at the time of the survey no private right in the property had yet attached and the question lay between the Federal Government and the State of California. But the distinction is immaterial. If tideland, the title of the State was complete on admission to the Union. No transfer to private parties was necessary to perfect or assure that title and no power of disposition remained with the United States.

To support their contention as to the conclusiveness of the survey and patent, petitioners largely rely upon our decision in *Knight* v. *United States Land Assn., supra.* But that decision is not in point, as it related to land which, albeit tideland, had been the subject of a Mexican grant made prior to statehood. What had there been done by the Federal Government was found to be in pursuance of the duty of the United States, imposed by the treaty of Guadalupe Hidalgo and the principles of international law, to protect the rights of property which had previously been created by the Mexican Government. The contest related to land in Mission Creek, an estuary of the bay of San Francisco. The plaintiffs claimed under a tideland grant from the State. The defendant's claim rested upon the title of the City of San Francisco as successor to the Mexican pueblo of that name. Following the procedure prescribed by statute with respect to the confirmation of such titles (Acts of March 3, 1851, 9 Stat. 631; July 1, 1864, 13 Stat. 332), the City had obtained a confirmatory decree from the United States Circuit Court in May, 1865. The statutes required that such a decree should be followed by a survey under the supervision of the General Land Office, and patent was to issue to the successful claimant when such survey had been finally ap-

proved. *Id.* Accordingly, after the decree in favor of the City, a survey was made, which was approved by the Surveyor General and the Commissioner of the General Land Office. The line of that survey ran along the line of ordinary high water mark of the bay of San Francisco, but in the case of the estuary followed the tideline up the creek and, crossing over, ran down on the other side. The City objected to that method, insisting that the line should have crossed the mouth of the estuary, and, on appeal, that contention was sustained by the Secretary of the Interior. A second survey was made pursuant to that decision and a patent was issued. 142 U. S. pp. 162–172. The plaintiffs contended that the first survey was correct and the second unauthorized. Reviewing that branch of the case, the Court decided that the Secretary of the Interior had power to set aside the first survey and direct another, and that the departmental action in that particular was unassailable. But that conclusion was not sufficient to meet the plaintiffs' claim under the state grant, unless it could be held that title to the land had not passed to the State. Upon that question the court found that the case of *San Francisco* v. *LeRoy,* 138 U. S. 656, 670, 672, was "directly in point," as the Court had there decided that "if there were any tide lands within the pueblo the power and duty of the United States under the treaty to protect the claims of the City of San Francisco as successor to the pueblo were superior to any subsequently acquired rights of California." 142 U. S. pp. 183-185. In discharge of that duty, provision had been made by Congress for the investigation and confirmation of the property rights of pueblos equally with those of individuals. The rights of the pueblo "were dependent upon Mexican laws, and when Mexico established those laws she was the owner of tide lands as well as uplands, and could have placed the boundaries of her pueblos wherever she thought proper." It was for the United States to ascertain those boundaries

when fixing the limits of the claim of the City as successor to the pueblo. *Id.,* pp. 186, 187. The obligation of protection was "political in its character, to be performed in such manner and on such terms as the United States might direct." Accordingly, Congress had established a special tribunal to consider claims derived from Mexico, had authorized determinations by the court upon appeal, and "had designated the officers who should in all cases survey and measure off the land when the validity of the claim presented was finally determined." *Id.,* pp. 202, 203. The survey upon which the patent rested in the *Knight* case was thus made pursuant to the authority reserved to the United States to enable it to discharge its international duty with respect to land which, although tideland, had not passed to the State. See *Shively* v. *Bowlby, supra,* pp. 30, 31; *United States* v. *Coronado Beach Co., supra.*

The distinguishing features of the instant case are apparent. No prior Mexican grant is here involved. We conclude that the State was not bound by the survey and patent, and that its grantee was entitled to show, if it could, that the land in question was tideland.

In this view it is not necessary to consider whether the lines designated in the plat of the Norway survey as "meander" lines were intended as boundaries.

3. As the District Court fell into a fundamental error in treating the survey and patent as conclusive, it was not incumbent upon the Court of Appeals to review the evidence and decide whether it showed, or failed to show, that the land in question was tideland. The court remanded the cause for a new trial in which the issues as to the boundary between upland and tideland, and as to the defenses urged by petitioners, are to be determined. In that disposition of the case we find no error.

4. There remains for our consideration, however, the ruling of the Court of Appeals in instructing the District

Court to ascertain as the boundary " the mean high tide line " and in thus rejecting the line of " neap tides."

Petitioners claim under a federal patent which, according to the plat, purported to convey land bordering on the Pacific Ocean. There is no question that the United States was free to convey the upland, and the patent affords no ground for holding that it did not convey all the title that the United States had in the premises. The question as to the extent of this federal grant, that is, as to the limit of the land conveyed, or the boundary between the upland and the tideland, is necessarily a federal question. It is a question which concerns the validity and effect of an act done by the United States; it involves the ascertainment of the essential basis of a right asserted under federal law. *Packer* v. *Bird,* 137 U. S. 661, 669, 670; *Brewer-Elliott Oil Co.* v. *United States,* 260 U. S. 77, 87; *United States* v. *Holt Bank,* 270 U. S. 49, 55, 56; *United States* v. *Utah,* 283 U. S. 64, 75. Rights and interests in the tideland, which is subject to the sovereignty of the State, are matters of local law. *Barney* v. *Keokuk,* 94 U. S. 324, 338; *Shively* v. *Bowlby, supra,* p. 40; *Hardin* v. *Jordan,* 140 U. S. 371, 382; *Port of Seattle* v. *Oregon & Washington R. Co.,* 255 U. S. 56, 63.

The tideland extends to the high water mark. *Hardin* v. *Jordan, supra; Shively* v. *Bowlby, supra; McGilvra* v. *Ross,* 215 U. S. 70, 79. This does not mean, as petitioners contend, a physical mark made upon the ground by the waters; it means the line of high water as determined by the course of the tides. By the civil law, the shore extends as far as the highest waves reach in winter. Inst. lib. 2, tit. 1, § 3; Dig. lib. 50, tit. 16, § 112. But by the common law, the shore " is confined to the flux and reflux of the sea at ordinary tides." *Blundell* v. *Catterall,* 5 B. & A. 268, 292. It is the land " between ordinary high and low-water mark, the land over which the daily tides

ebb and flow. When, therefore, the sea, or a bay, is named as a boundary, the line of ordinary high-water mark is always intended where the common law prevails." *United States* v. *Pacheco,* 2 Wall. 587, 590.

The range of the tide at any given place varies from day to day, and the question is, how is the line of " ordinary " high water to be determined? The range of the tide at times of new moon and full moon " is greater than the average," as " high water then rises higher and low water falls lower than usual." The tides at such times are called " spring tides." When the moon is in its first and third quarters, " the tide does not rise as high nor fall as low as on the average." At such times the tides are known as " neap tides." " Tidal Datum Plane," U. S. Coast and Geodetic Survey, Special Publication No. 135, p. 3.[2] The view that " neap tides " should be taken as the ordinary tides had its origin in the statement of Lord Hale. *De Jure Maris,* cap. VI; Hall on the Sea Shore, p. 10, App. xxiii, xxiv. In his classification, there are " three sorts of shores, or *littora marina,* according to the various tides," (1) " The high spring tides, which are the fluxes of the sea at those tides that happen at the two equinoxials "; (2) " The spring tides, which happen twice

[2] See " The Tide," H. A. Marmer, Assistant Chief, Division of Tides and Currents, U. S. Coast and Geodetic Survey, pp. 9, 10. " There is generally an interval of one or two days between full moon or new moon and the greatest range of the tide. And a like interval is found between the first and third quarters of the moon and the smallest tides." *Id.,* p. 11.

The origin of the terms spring and neap tides " is probably due to the fact that as the moon leaves the meridian of the sun in her orbital transit round the earth and approaches the quarters the tides begin to ' fall off ' or are ' nipped,' and neap tides ensue. As she leaves the quarters for the meridian they begin to ' lift,' or ' come on,' or ' spring up,' and when the meridian is reached spring tides ensue." "A Practical Manual of Tides and Waves," W. H. Wheeler, p. 49.

every month at full and change of the moon "; and (3) " Ordinary tides, or nepe tides, which happen between the full and change of the moon." The last kind of shore, said Lord Hale, " is that which is properly *littus maris.*" He thus excluded the " spring tides " of the month, assigning as the reason that " for the most part the lands covered with these fluxes are dry and maniorable," that is, not reached by the tides.

The subject was thoroughly considered in the case of *Attorney General* v. *Chambers,* 4 De G. M. & G. 206. In that case Lord Chancellor Cranworth invited Mr. Baron Alderson and Mr. Justice Maule to assist in the determination of the question as to " the extent of the right of the Crown to the seashore." Those judges gave as their opinion that the average of the " medium tides in each quarter of a lunar revolution during the year " fixed the limit of the shore. Adverting to the statement of Lord Hale, they thought that the reason he gave would be a guide to the proper determination. " What," they asked, are " the lands which for the most part of the year are reached and covered by the tides?" They found that the same reason that excluded the highest tides of the month, the spring tides, also excluded the lowest high tides, the neaps, for " the highest or spring-tides and the lowest high tides (those at the neaps) happen as often as each other." Accordingly, the judges thought that " the medium tides of each quarter of the tidal period " afforded the best criterion. They said: " It is true of the limit of the shore reached by these tides that it is more frequently reached and covered by the tide than left uncovered by it. For about three days it is exceeded, and for about three days it is left short, and on one day it is reached. This point of the shore therefore is about four days in every week, *i. e.* for the most part of the year, reached and covered by the tides." *Id.,* p. 214.

Having received this opinion, the Lord Chancellor stated his own. He thought that the authorities had left the question " very much at large." Looking at " the principle of the rule which gives the shore to the Crown," and finding that principle to be that " it is land not capable of ordinary cultivation or occupation, and so is in the nature of unappropriated soil," the Lord Chancellor thus stated his conclusion: " Lord Hale gives as his reason for thinking that lands only covered by the high spring-tides do not belong to the Crown, that such lands are for the most part dry and maniorable; and taking this passage as the only authority at all capable of guiding us, the reasonable conclusion is that the Crown's right is limited to land which is for the most part not dry or maniorable. The learned Judges whose assistance I had in this very obscure question point out that the limit indicating such land is the line of the medium high tide between the springs and the neaps. All land below that line is more often than not covered at high water, and so may justly be said, in the language of Lord Hale, to be covered by the ordinary flux of the sea. This cannot be said of any land above that line." The Lord Chancellor therefore concurred with the opinion of the judges " in thinking that the medium line must be treated as bounding the right of the Crown." Id., p. 217.[3]

This conclusion appears to have been approved in Massachusetts. Commonwealth v. Roxbury, 9 Gray 451, 483; East Boston Co. v. Commonwealth, 203 Mass. 68, 72; 89 N. E. 236. See, also, New Jersey Zinc Co. v. Morris Canal Co., 44 N. J. Eq. 398, 401; 15 Atl. 227; Gould on Waters, p. 62.

In California, the Acts of 1911 and 1917, upon which the City of Los Angeles bases its claim, grant the " tide-

---

[3] See, also, Tracey Elliott v. Earl of Morley, Ch. Div. 51 Sol. Journal (1907), 625.

26

lands and submerged lands " situated " below the line of
mean high tide of the Pacific Ocean." [4]  Petitioners urge
that " ordinary high water mark " has been defined by
the state court as referring to the line of the neap tides.[5]
We find it unnecessary to review the cases cited or to
attempt to determine whether they record a final judg-
ment as to the construction of the state statute, which,
of course, is a question for the state courts.

In determining the limit of the federal grant, we per-
ceive no justification for taking neap high tides, or the
mean of those tides, as the boundary between upland and
tideland, and for thus excluding from the shore the land
which is actually covered by the tides most of the time.
In order to include the land that is thus covered, it is
necessary to take the mean high tide line which, as the
Court of Appeals said, is neither the spring tide nor the
neap tide, but a mean of all the high tides.

In view of the definition of the mean high tide, as given
by the United States Coast and Geodetic Survey,[6] that
" Mean high water at any place is the average height of
all the high waters at that place over a considerable

4 See Note 1.

[5] See *Teschemacher* v. *Thompson*, 18 Cal. 11, 21; *Ward* v. *Mulford*,
32 Cal. 365, 373; *Eichelberger* v. *Mills Land & Water Co.*, 9 Cal. App.
628, 639; 100 Pac. 117; *Forgeus* v. *County of Santa Cruz*, 24 Cal.
App. 193, 195; 140 Pac. 1092; *F. A. Hihn Co.* v. *City of Santa Cruz*,
170 Cal. 436, 442; 150 Pac. 62; *Oakland* v. *Wood Lumber Co.*, 211
Cal. 16, 23; 292 Pac. 1076; *Otey* v. *Carmel Sanitary District*, 219
Cal. 310, 313; 26 P. (2d) 308. In a number of cases the state court
has referred to the limit of the shore as the " ordinary " high water
mark. See *Wright* v. *Seymour*, 69 Cal. 122, 126; 10 Pac. 323; *Long
Beach Co.* v. *Richardson*, 70 Cal. 206; 11 Pac. 695; *Oakland* v. *Oak-
land Water Front Co.*, 118 Cal. 160, 183; 50 Pac. 277; *Pacific Whal-
ing Co.* v. *Packers' Association*, 138 Cal. 632, 635, 636; 72 Pac. 161;
*People* v. *California Fish Co.*, 166 Cal. 576, 584; 138 Pac. 79. See,
also, *Strand Improvement Co.* v. *Long Beach*, 173 Cal. 765, 770; 161
Pac. 975; *Miller & Lux* v. *Secara*, 193 Cal. 755, 761, 762; 227 Pac. 171.

[6] " Tidal Datum Plane," Special Publication No. 135, p. 76.

period of time," and the further observation that " from theoretical considerations of an astronomical character " there should be a " a periodic variation in the rise of water above sea level having a period of 18.6 years," [7] the Court of Appeals directed that in order to ascertain the mean high tide line with requisite certainty in fixing the boundary of valuable tidelands, such as those here in question appear to be, " an average of 18.6 years should be determined as near as possible." We find no error in that instruction.

The decree of the Court of Appeals is

*Affirmed.*

MR. JUSTICE McREYNOLDS is of opinion that *Knight* v. *United States Land Assn.*, 142 U. S. 161, is controlling and that the decree of the District Court should be affirmed.