UNITED STATES of America, Plaintiff

v.

Iolanda PONTE, Trustee, Edward and Iolanda Ponte Memorial Trust; and Paula Stone a/k/a Fauna Stone, Trustee, Samsara Memorial Trust, Defendants

No. CIV. 99–281–B–H.

United States District Court, D. Maine.

Feb. 27, 2003.

James M. Moore, Esq., Assistant United States Attorney, United States Attorney's Office, Bangor, ME, for United States of America, Plaintiff.

Iolanda Ponte, Bar Harbor, ME, Pro Se.

Paula Stone, Bar Harbor, ME, Pro se.

## DECISION AND ORDER ON GOVERNMENT'S MOTION FOR ENTRY OF JUDGMENT BY DEFAULT AND DEFENDANT STONE'S MOTION TO SET ASIDE DEFAULT

HORNBY, District Judge.

These motions for default judgment and to set aside default involve enforcement of a government-held conservation easement on Black Island. Black Island lies in the vicinity of Acadia National Park. The contested easement language provides:

> No new structures, except those for which immediate proximity to the water is essential, shall be located within the area between low and high water marks of the Property or between mean high water mark and a line parallel to, and set back 100 feet from, said high water mark.

Conservation Easement, Book 1205, Page 500, at 505 (Hancock County Registry Deeds, Aug. 28, 1974) (Docket No. 81). The government seeks to enforce its conservation easement over the property. Fee ownership of the property has belonged successively to two trusts during the course of this lawsuit. At this point, the government seeks injunctive relief against the trusts and the trustees to compel them to remove a 20 by 24 foot platform or floor frame from the property.

The case has become a procedural morass. It has been pending since 1999 and has had three district judges and two magistrate judges. The defendants have had two lawyers,[1] and currently have none. Settlements have come and gone. Default judgments have been entered and removed. During the pendency of the lawsuit, the initial defendants conveyed the property and new defendants were added. Entry of default remains in place against all defendants. Individuals, the named trustees, have appeared and filed papers. They have been warned time and again that they cannot represent the trusts in federal court because only lawyers can represent entities, *see, e.g., Knoefler v. United Bank of Bismarck,* 20 F.3d 347,

---

[1] They have also had at least one additional lawyer who did not enter an appearance.

*See, e.g.,* Report Pretrial Conf. & Order at 2 (Docket No. 26).

348 (8th Cir.1994); *C.E. Pope Equity Trust v. United States*, 818 F.2d 696, 697–98 (9th Cir.1987), but to no avail. Most recently I held a hearing on the government's request for default judgment. No lawyer for the defendants appeared. Dr. Paula Stone appeared, purporting to represent herself as a trustee; there was not even a purported appearance for her mother as a trustee of a different trust, or for the two trusts.

At the default judgment hearing the government stated on the record that it no longer seeks enforcement of a previous settlement agreement and no longer seeks removal of a certain pier and two floats. The government does continue to seek removal of the platform.

## I. DEFAULT JUDGMENT

Two critical issues must be resolved before any default judgment can be entered:

1. Is the easement's 100–foot setback (the area "between mean high water mark and a line parallel to, and set back 100 feet from, said high water mark") to be mea-

sured horizontally,[2] or over the face of the earth[3] on this sloping property? The answer determines whether the platform offends the easement.

2. Is the offending structure one "for which immediate proximity to the water is essential"?

▮▮▮ The legal effect of entry of default is clear; entry of default does not automatically entitle the plaintiff to the relief it seeks, but it does amount to an admission by the defendants of the material allegations of the complaint. *Ortiz–Gonzalez v. Fonovisa*, 277 F.3d 59, 62–63 (1st Cir.2002). A plaintiff must nevertheless establish that on the law it is entitled to the relief it seeks, given the facts as established by the default. *Bonilla v. Trebol Motors Corp.*, 150 F.3d 77, 80 (1st Cir.1998). Here, the default results in an admission that the conservation easement applies to the property,[4] and that a structure exists where it should not be, at least if the government's measurement method is accepted.[5] It does not amount to an admission in the government's favor of the

2. "The horizontal measurement methodology contemplates measurement of the designated distance by extending lines vertically from the two points on the ground between which the surveyor is measuring and then measuring along a horizontal straight line perpendicular to these two lines." *Town of Union v. Strong*, 681 A.2d 14, 17 n. 3 (Me.1996). I am not persuaded by the government's argument that the use of the term "parallel lines" in the text of the easement *ipso facto* requires horizontal measurement. Although parallel lines are in a plane, there is an infinite variety of possible planes.

3. This method "requires the surveyor to measure the required distance in a straight line along the surface of the earth." *Id.*

4. Dr. Stone suggests that the government has the wrong chain of title and therefore cannot enforce the easement. Defs.' Position Br. at 1–3 (Docket No. 83). She is foreclosed from doing so by the default. Moreover, there are three Black Island conservation easements, in

different chains of title, but each has identical language on the issues before the court. There is no substantial assertion that the property in question is governed by none of them.

5. As a result of the entry of default, the following material allegation of the Amended Complaint is deemed admitted:

Unknown to the plaintiff, at some time during 1998, the defendant Ponte Memorial Trust had constructed or authorized, arranged and entered an agreement for construction on the Black Island property *within the area between mean high water mark and a line parallel to, and set back 100 feet from said high water mark within which construction of such structures is prohibited pursuant to the said conservation easement* a concrete post and rebar foundation with wooden posts and a floor frame 24 feet long by 20 feet wide and four to six feet in height....

two issues I have outlined. The government still must satisfy me that I should order the structure removed as a result of interpreting the easement, and the trustees can still attempt to persuade me that their structure fits within the easement's "essential" exception.[6]

I turn, therefore, to where the law and the record stand on the two issues.[7]

■ As for the method of measurement, the default establishes that the platform in question is within the prohibited distance from mean high water mark,[8] measured

Am. Compl. ¶ 8 (Docket No. 38) (emphasis added). The defendants concede that the platform lies within the 100 foot setback only if the horizontal method of measurement is used and lies beyond the 100 foot setback if over-the-ground measurement is used. Defs.' Position Brief at 4–5. In a final attempt to avoid the government's requested relief of removal of the offending platform, the defendants also appear to concede that the platform violates the setback restriction by 20 feet using horizontal measurement.

> Most importantly, the disruption to the land that will result from removing the platform will be greater than any harm which is done by it remaining there; in other words, the Plaintiff's proposed remedy is worse than the alleged violation. *And if the platform is moved back 20 feet,* the clearing of trees required will be a visual scar that will violate the alleged easement, especially because it would have to be moved back more like 100 feet, since directly behind the 20 × 24 platform, there is first a vertical cliff, and then a very steep slope for another approximately 100 feet.

*Id.* at 14–15 (emphasis added).

6. Dr. Stone also argues that the government's actions constitute failure to properly administer the easement, selective enforcement of the easement, harassment of the defendants, retaliation for Dr. Stone's previous complaint against the Park Service for misrepresentation of government policies, abusive litigation, and deliberate misrepresentation of facts. The first four are irrelevant and the last two unsubstantiated, and I do not consider them.

7. On the legal issues, I am greatly hampered by the trustees' failure to hire a lawyer. Their positions on important real estate conveyancing issues are presented in amateurish and confusing fashion. Moreover, the absence of effective advocacy for the defendants results in the issues being ill-formed and shifting and does not produce the clarity in argument from the government that a sharply focused opponent would generate. In a word, development of the issues is muddled. This is particularly troubling in an area that affects conveyancing for there, perhaps more than any other legal area, a court pronouncement affects future practices.

8. "Mean high water mark" is a "monument" according to Maine conveyancing law. *Proctor v. Hinkley,* 462 A.2d 465, 470 (Me.1983). What the term means is a question of law for me as the judge. Where it is located on the face of the earth is ordinarily a question of fact that I as factfinder must determine. *Id.* at 469 ("What the boundaries are, as ascertained from the language of a deed, is a question of law; where they are on the face of the earth is a question of fact.").

The United States Supreme Court has defined the term "mean high water mark." The Supreme Court concluded that the term high water mark "does not mean ... a physical mark made upon the ground by the waters; it means the line of high water as determined by the course of the tides." *Borax Consol. v. City of Los Angeles,* 296 U.S. 10, 22, 56 S.Ct. 23, 80 L.Ed. 9 (1935). The Court treated mean high water mark as equivalent to mean high tide line and approved using the definition of the United States Coast and Geodetic Survey for interpreting this standard: " 'Mean high water at any place is the average height of all the high waters at that place over a considerable period of time.' " *Id.* at 26–27, 56 S.Ct. 23 (quoting Tidal Datum Plane, Special Publication No. 135, at 76). The Court noted "that 'from theoretical considerations of an astronomical character' there should be 'a periodic variation in the rise of water above sea level having a period of 18.6 years.' " *Id.* at 27, 56 S.Ct. 23 (quoting Tidal Datum Plane, Special Publication No. 135, at 81). It therefore approved the Ninth Circuit's instruction to a trial court that, to ascertain a mean high tide line, "an average for 18.6 years should be determined as near as possible by observation or calculation." *Id.* at 14–15, 56 S.Ct. 23; *see*

horizontally, but not if measured over-the-ground. Defs.' Position Br. at 5, 14 (Docket No. 83); Defs.' Response Mot. Default Ex. A at 1 (Docket No. 47); Answer at 2 (Docket No. 9) (answer for Iolanda Ponte only). The government asks me to declare that horizontal measurement is the only way to measure easement descriptions in the State of Maine, and therefore that the structure must be removed.

Maine's Law Court has said that the horizontal method is the "common" method of measuring distances, *Town of Union v. Strong*, 681 A.2d 14, 18 (Me.1996),[9] using

---

*also Carolina Beach Fishing Pier, Inc. v. Town of Carolina Beach*, 277 N.C. 297, 177 S.E.2d 513, 516 (1970) ("The high-water mark is generally computed as a mean or average high-tide, and not as the extreme height of the water."). The Supreme Court's definition is persuasive because it demonstrates linguistic usage known to lawyers before this easement language was drafted, not because federal law controls. No one argues that federal law controls; this easement appears in a private deed in which a private corporation conveyed an easement over Maine real property, albeit to the federal government. *See Wallis v. Pan Am. Petroleum Corp.*, 384 U.S. 63, 70–71, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966) (holding federal common law does not apply to dealings of private parties in oil and gas leases concerning federal lands). In fact, Maine statutory usage near the same time as the easement was created is consistent. The Saco River statute, as publicly enacted in 1979, defines mean high water line as the "average high tide level." An Act Concerning the Saco River Corridor Commission, ch. 459, § 1, 1979 Me. Laws 746, 749; *see also* 38 M.R.S.A. § 952. An earlier version of the statute, enacted as a private and special law in 1973, defines it as "the line delineated by the United States Geological Survey for the tidal portion of a river or estuary showing the location of the annual average high tide level." An Act to Establish a Saco River Corridor, ch. 150, § 1, 1973 Me. Laws 1605, 1608; *see also Black's Law Dictionary* 's definition of "mean high water mark": "[t]he point on the shore which the average high tide will reach." Black's Law Dictionary 980 (6th ed.1990) (the definition argued for by the government).

I conclude that mean high water mark means an average, not a physical mark. This is to be distinguished from "normal high-water line," defined by Maine statute as "that line which is apparent from visible markings, changes in the character of soils due to prolonged action of the water or changes in vegetation, and which distinguishes between predominantly aquatic and predominantly

terrestrial land." 38 M.R.S.A. § 436–A(9) (the definition argued for by Dr. Stone).

At this point, I have not been informed how either party's surveyor proposes to determine the mean, whether by observation or calculation. *See Borax*, 296 U.S. at 15, 56 S.Ct. 23; *see also* National Oceanic and Atmospheric Administration, National Ocean Service, Center for Operational Oceanographic Products and Services, *http://www.co-ops.nos.noaa.gov* (collecting historical and current measurements of mean high water from various coastal stations in Maine). Given the consequence of the defendants' default and my conclusion in text on how distance is to be measured, the distinction is irrelevant for the permissibility of the defendants' structure.

9. Horizontal is not the only method. The ordinance the Law Court interpreted in *Strong* as requiring horizontal measurement for some purposes required over-the-ground measurement for other purposes. 681 A.2d at 17; *see also* Walter G. Robillard et al., Brown's Boundary Control and Legal Principles 45 (4th ed.1995):

> In GLO [General Land Office] surveys the presumption is that all measurements are horizontal along a straight line because the law required the surveyors to perform as such.
> In the metes and bounds states the early measurements are presumed to be "slope" or "along the lay of the land." However, the contrary may always be proved.
> [The GLO survey] presumption has not always been in effect; in a few localities proof has been found indicating that original measurements were made along the surface . . . . [Kentucky case citation].

Although Maine was a metes-and-bounds state, *see* Paul G. Creteau, Maine Real Estate Law 204 (1969), horizontal measurement is the "modern" method of measurement according to the Law Court. *Strong*, 681 A.2d at 18 (citing Walter G. Robillard et al., Brown's Boundary Control and Legal Princi-

as authority a 1962 text, Curtis M. Brown & Winfield H. Eldridge, Evidence and Procedures for Boundary Location (1962), a text that was extant at the time this easement was drafted. Another text the Law Court cites states the principle that a surveyor must consider usage at the time a particular deed description was drafted. Walter G. Robillard et al., Brown's Boundary Control and Legal Principles 42 (4th ed. 1995) ("The unit of measurement indicated in the description is that unit of measurement used at the time of the survey or when the description was written."). Horizontal measurement, therefore, is appropriate for this 1974 easement. There is nothing to suggest that the parties to this conservation easement had anything different in mind.[10]

■ On the second issue, there is no showing or even suggestion why immediate proximity to the water is "essential" for the platform structure. This is an issue where the trustees have the burden, since it is an exception to the easement's restrictions.[11] What Dr. Stone says is:

The platform functions in several critical ways, as follows:

a. The ground under the platform is seasonally wet, and very uneven, with large boulders. Without the platform, there would be no surface upon which to store materials, work, walk, sit, or even rest.

b. Picture, if you will, the logistical problems connected with this site. A barge arrives at high tide, which is the only time when it is able to unload materials onto the dock, and unloads lumber, or supplies for the summer season, such as food, fuel, etc. These things must be carried by hand up to the house or to the building site. Part way up, there must be a place where these things can be set down, or temporarily stored. At a normal house, there

---

ples 45 (1995)). The method has been advocated since at least the late 18th century. Curtis M. Brown & Winfield H. Eldridge, Evidence and Procedures for Boundary Location 112–13 (1962); see also Robillard et al., supra, at 79 (quoting Edward Tiffin's instructions to Northwest Territory surveyors in 1815 to use horizontal measurements, not over the surface of the ground).

10. Under Dr. Stone's interpretation, a structure perched oceanside on the edge of a 100–foot vertical precipice would satisfy the setback.

11. The suggestion that if they do not build the platform here, they will build it somewhere else on the parcel that will be more disruptive is not an adequate basis. The trustees also try to justify their structure under a preceding paragraph of the easement, for accessory-type structures. Specifically, the easement language provides:

4. There is also reserved to the Grantor, its successors and assigns, the right to build any non-residential structure accessory to any permitted residence or useful in connection with any permitted use of the Property (including construction to provide utilities to the residence and accessory structures) provided any such structure is located so as not unnecessarily to alter the natural and scenic appearance of the landscape when viewed from offshore or from the property of any other landowner on said Black Island.

5. No new structures, except those for which immediate proximity to the water is essential, shall be located within the area between low and high water marks of the Property or between mean high water mark and a line parallel to, and set back 100 feet from, said high water mark. There shall be not more than one float or pier on the Property.

Conservation Easement, Book 1205, Page 500, at 505 (Hancock County Registry Deeds, Aug. 28, 1974). The only reasonable way to read this language is that paragraph 5 is a further restriction upon paragraph 4. Therefore, if the structure does not satisfy paragraph 5, paragraph 4 is of no help to the trustees.

are driveways and garages for this purpose, but here there is only dense forest and rocky ground, and so there must be the functional equivalent of road access in order to serve the needs of safety and convenience; the various platforms, ramps, and stairs perform that function.

Defs.' Position Br. at 13.[12] Much as this may describe why Dr. Stone would like to have the platform where it is, it does not in any way demonstrate that "immediate proximity to the water is essential" for the 20 × 24 foot platform.

Accordingly, I conclude that the government is entitled to default judgment unless the default should be set aside.

## II. ENTRY OF DEFAULT

 Dr. Stone has moved, on behalf of herself, as Trustee of the Samsara Memorial Trust, and her mother, Iolanda Ponte, as Trustee of the Edward and Iolanda Ponte Memorial Trust, to set aside the entry of default. Defs.' Mot. Set Aside Default (Docket No. 82). She made an oral request to the same effect at the hearing. I DENY the motion. First, as a

nonlawyer she is unable to represent her mother in federal court. Thus, neither Iolanda Ponte, nor the two trusts, have effectively requested removal of the default.[13] Second, Rule 55(c) of the Federal Rules of Civil Procedure permits a court to set aside an entry of default only for good cause shown. Dr. Stone claims that the entry of default should be vacated because the default was not willful and the defendants have a meritorious defense, as partially presented at the hearing before this court on December 18, 2002. She contends that the default was a result of improper service of the Amended Complaint and the defendants' unawareness that a motion to set aside the default should have been filed. The burden of demonstrating good cause lies with the party seeking to set aside the default. *KPS & Assocs., Inc. v. Designs by FMC, Inc.,* 318 F.3d 1, 14 (1st Cir.2003). While any action upon such a motion is a matter of sound discretion, the First Circuit has set out factors to consider:

(1) whether the default was willful; (2) whether setting it aside would prejudice the adversary; (3) whether a meritorious defense is presented; (4) the nature of the defendant's explanation for the

---

**12.** In earlier filings, the defendants stated that the platform "was intended to be the beginning of a residence." Answer at 3 (Docket No. 9); *see also* Defs.' Position Br. at 8–9 (Docket No. 83).

**13.** Actually, Paula Stone also cannot request removal of the default in any capacity because she is a party only in her capacity as trustee, not as an individual. Dr. Stone appears in the lawsuit in her fiduciary capacity because as trustee she holds title to the real estate. That is solely a representative capacity, and one that requires a lawyer in federal court. *See, e.g., C.E. Pope Equity Trust v. United States,* 818 F.2d 696, 698 (9th Cir.1987) ("He may not claim that his status as trustee includes the right to present arguments *pro se* in federal court."); *accord Knoefler v. United Bank of Bismarck,* 20 F.3d 347 (8th Cir.1994);

*United States v. Stepard,* 876 F.Supp. 214 (D.Ariz.1994); *Oregon v. Loe,* 65 B.R. 16, 18 (D.Or.1986) ("'[H]e may not represent the Trust by bringing an action in his capacity as Trustee."). The same result would occur in Maine courts. *See, e.g., Boutet v. Miller,* No. Civ. A. CV–00–698, 2001 WL 1711531, at *1 (Me.Super. Mar. 9, 2001) ("While a trust is not a person in the legal sense and the trustee is the proper person to sue or be sued on behalf of the trust, 'a trustee's duties in connection with his or her office do not include the right to present argument *pro se* in courts of the state ....'") (citation omitted). Both the government and earlier rulings by a magistrate judge, however, have allowed Dr. Stone to believe that she could proceed as trustee without a lawyer. I therefore do not rely on this element of the default.

default; (5) the good faith of the parties; (6) the amount of money involved; (7) the timing of the motion [to set aside entry of default].

*Id.* at 12 (quoting *McKinnon v. Kwong Wah Rest.*, 83 F.3d 498, 503 (1st Cir.1996)).

Dr. Stone's conduct certainly borders on willful (factor 1), given her machinations about where she will accept mail for service of process and her refusal to hire counsel despite this court's repeated admonishments that a trust cannot be represented in federal court by laypeople. She was on notice that the defendants were in default by order of this court on November 4, 2002, but waited until December 18, 2002, and January 15, 2003 (factors 2 and 7), to make her first and second requests, respectively, to set aside the default. Dr. Stone has no decent explanation (factor 4) establishing good cause and I question her good faith on the issue (factor 5).[14] Up until now, she has effectively obstructed bringing the case to a conclusion, and thus there would be prejudice (factor 2) to the government by removing the default at this late date. As for the amount of money involved (factor 6), it is not determinable at this time, but I assume that the defendants' use of the property is important. I have considered any meritorious defenses (factor 3) in dealing with the default judgment. Thus, the balance of factors is against removing the default.

Moreover, none of the listed factors is determinative. According to the First Circuit:

> This flexibility is necessitated by the competing policies and values that underlie the concept of default. On the one hand, it "provide[s] a useful remedy when a litigant is confronted by an obstructionist adversary," and "play[s] a constructive role in maintaining the orderly and efficient administration of justice." It furnishes an invaluable incentive for parties to comply with court orders and rules of procedure. It encourages the expeditious resolution of litigation and promotes finality. On the other hand, countervailing considerations include the goals of "resol[ving] cases on the merits," and avoiding "harsh or unfair result[s]."

*KPS*, 318 F.3d at 12–13. Given these concerns, a review of the record in this case makes abundantly clear why default should not be removed.[15] The trustees have been obstructionist and have interfered with the orderly and efficient progress of the case, brazenly ignoring court orders and procedural rules and delaying finality. Moreover, their significant defenses have been considered in the context of the motion for default judgment. For these reasons, I conclude that good cause has not been shown to remove the default.

The motion to remove default is **DENIED**. The motion for default judgment is **GRANTED**. It is hereby **ORDERED** that:

1. By June 1, 2003, the defendants shall have the offending 20 by 24 foot platform and all its supports removed.

2. The United States is authorized thereafter to remove the offending platform and its supports if the defendants have not removed it by June 1, 2003.

3. The defendants shall restore the area where the platform sits to its condition before construction.

4. The defendants are **PERMANENTLY ENJOINED AND RESTRAINED** from trespassing

---

14. The specious issues Dr. Stone raises, *see* footnote 6, confirm the view that she is engaging in obstructionism.

15. See Appendix A for a partial summary of the procedural history.

on the conservation easement of the United States.

So Ordered.

## APPENDIX A
### PROCEDURAL HISTORY

United States v. Iolanda Ponte, et al.
Civil No. 99-2810B-H

This is a chronological summary of a portion of the procedural history in this matter, highlighting requests for extensions of time, notices and entries of default, and address changes of the defendants.

| | |
|---|---|
| 12/08/99 | Original Complaint filed against Iolanda Ponte ("Ponte") and Edward and Iolanda Ponte Memorial Trust ("Ponte Trust") |
| 12/29/99 | Ponte and Ponte Trust request 90–day extension (first extension) to answer, request temporary order restraining government from trespassing upon the property, and request that all future correspondence be sent to P.O. Box 112, Seal Harbor, ME 04675 |
| | Order granting extension until 04/03/00 for answer, denying temporary restraining order, and reminding the defendants (first reminder) that a non-lawyer cannot enter an appearance on behalf of an entity |
| 03/29/00 | Order striking answer on behalf of Ponte Trust for failure to observe D. Me. R. 83.1(c) (trust cannot appear *pro se* ) (second reminder) and warning the defendants that they are subject to default (first mention of default); deadline for filing answer enlarged to 04/10/00 (second extension) |
| 04/10/00 | Motion by Attorney Bates on behalf of Ponte Trust to extend time to answer until 05/01/00 (motion mentions Paula Stone is taking care of the matter on behalf of her mother) (third extension)—GRANTED until 04/24/00 |
| 04/17/00 | Attorney Bates moves to withdraw and requests extension for filing answer (fourth extension) |
| 04/18/00 | Ponte files answer |
| | Response to Order striking answer on behalf of Ponte Trust, claiming the defendants did not understand trust could not be represented through trustee, did not understand there were two defendants, cannot afford attorneys, acknowledges cannot represent Ponte Trust, and requests dismissal of Ponte Trust—STRICKEN 05/11/00 |
| 04/25/00 | Motion for Default filed (second mention of default) |
| 05/11/00 | Order defaulting Ponte Trust (third mention of default) for failure to appear or file an answer |
| | [pretrial filings and settlement discussions] |
| 03/15/01 | Letter from Magistrate Judge Kravchuk to Paula Stone ("Stone") regarding settlement issues, including reminder that Ponte Trust is in default (fourth mention of default) |
| | [settlement discussions] |
| 10/23/01 | Motion to amend complaint to add Stone and Samsara Memorial Trust ("Samsara Trust") as property was transferred to Samsara Trust on or about August 1, 2001 but the plaintiff did not learn of the conveyance until 10/22/01—GRANTED 11/02/01 |
| 11/01/01 | Defendants object to motions to enforce settlement agreement and to amend the complaint, indicating they have been away since September and have just received the recent filings and claiming the plaintiff intentionally waited until |

then to file responses knowing that the defendants would be unavailable (request additional time to seek legal counsel) (fifth extension)

| | |
|---|---|
| 11/08/01 | Amended Complaint filed; four summonses issued with Seal Harbor address |
| 11/13/01 | Motion by the defendants to dismiss on the basis that the plaintiff did not respond to the defendants' proposed settlement easement of May 2001 until September 2001 and response was unsatisfactory—DENIED 12/05/01 |
| 11/21/01 | Letter (from Seal Harbor address) from the defendants to Magistrate Judge Kravchuk proposing settlement agreement, which includes promise not to build any permanent residence on the platform, indicating that they do not agree that the horizontal method of measuring distances is required by the easement, and representing that Stone will call the court next week to see if there are any additional filings, is not planning to be in Maine for the next few months or to pick up her mail, and cannot revolve her life around the Park Service who did not get back to her during the summer when she was available |
| 11/30/01 | Letter from Magistrate Judge Kravchuk to Stone advising her of case status and that scheduling is out of her control |
| 12/13/01 | Four new summonses issued with Bar Harbor, ME 04609 address (no specific street address on summonses) |
| 01/03/02 | Court enters change of address for Ponte from Seal Harbor to 182 Otter Cliff Road, Bar Harbor, ME |
| 01/25/02 | Motion For Extension of Time for Service/Service by Publication: copies of Amended Complaint mailed to Seal Harbor address on 11/08/01 but returned as "unclaimed" during the final week of November; copies sent to Pownal, VT, an address used earlier by Ponte and the Ponte Trust, returned as "undeliverable"; the plaintiff placed telephone calls to Stone on 12/12/01 (phone number changed), contacted her advisor and professor at the University of Maine (they had same old phone number, same e-mail, and Seal Harbor address), attempted to send her e-mails, and made over twenty visits to her last known address in Maine on Otter Cliffs Road, Bar Harbor (12/14/01–12/16/01; 12/19–12/22; 12/26–12/30; and 1/2/02–1/13/02)—GRANTED 01/29/02 (at least fifth mention of default) |
| 01/29/02 | Order authorizing service by publication and by leaving copies at place of abode (Manski Declaration dated 03/13/02 indicates copies were left at Otter Cliffs Road, Bar Harbor address) |
| 03/13/02 | Motion for Default Judgment on basis of prejudice by over two-year delay and failure to respond to Amended Complaint |
| 03/15/02 | Motion for Default against Ponte, Stone, and Samsara Trust (Ponte Trust defaulted 05/11/00) (sixth mention of default) |
| 04/05/02 | Defendants' Motion for Jury Trial and to Restrain Park Service from Trespassing; Response to Motion for Default (seventh mention of default), indicating the defendants were not in Maine since November 2001 and last pleading received was Order of 11/02/01 (granting leave to file amended complaint so the defendants were on notice that Amended Complaint would be forthcoming) and representing they will not be in Maine for another few weeks so cannot read the contents of the Amended Complaint, Order permitting service by publication, or Motion for Default (address is 182 Otter Cliff Road, Bar Harbor, the location visited a dozen times for attempt to personally serve the Amended Complaint) |
| 04/11/02 | Order Defaulting Ponte, Stone and Samsara Trust on basis that service has been effected in accordance with the procedures of the court and the defendants have failed to plead or otherwise appear and have failed to proffer any excuse for their neglect |
| 04/17/02 | Court enters change of address for Stone from Seal Harbor to Otter Cliff Road, Bar Harbor |

| | |
|---|---|
| 05/08/02 | Motion by Attorney Cloutier on behalf of the defendants to set aside default judgment pursuant to Rule 55(c) and request for extension of time to respond to Amended Complaint (at least sixth extension)—GRANTED 09/23/02 |
| 06/11/02 | Order Granting the defendants' Motion for Stay pending outcome of Motion to Set Aside Default |
| 09/23/02 | Consent Judgment |
| | Endorsement entered granting the defendants' Motion to Set Aside Default Judgment (and request for extension of time to respond to Amended Complaint) |
| 10/02/02 | Attorney Cloutier moves to withdraw—GRANTED 11/04/02 |
| 11/01/02 | Defendants' Request for Extension of Time to File Reply—MOOT (seventh extension) |
| 11/04/02 | Order vacating Judge Singal's orders, Consent Judgment and Default Judgment; denying the defendants' motion to dismiss; reminding the defendants that trusts cannot appear *pro se* (at least third reminder); denying request for jury trial; and denying motion to enter the defendants' proposed consent judgment—all the defendants in default (eighth mention of default) |
| 12/03/02 | Defendants' Motion to Continue Hearing—DENIED (eighth extension) |
| 12/09/02 | Defendants' Motion for Reconsideration, citing Rules 55 and 60—DENIED (ninth extension) |
| 12/18/02 | Hearing—oral motion for default (ninth mention of default)—DENIED on grounds that request was not timely and no adequate basis to excuse |